No. 80,804

INVESTCORP, L.P., *et al., Appellants,* v. SIMPSON INVESTMENT COMPANY, L.C., *Appellees.*

(983 P.2d 265)

Opinion filed July 16, 1999.

*Mick W. Lerner,* Law Office of Mick Lerner, P.A, of Overland Park, argued the cause and was on the briefs for appellants.

*John L. Vratil,* of Lathrop & Gage, L.C., of Overland Park, argued the cause, and *Brett D. Anders* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This summary judgment case involves a family controversy over the dissolution of a Limited Liability Company (LLC). The LLC was organized under the Kansas Limited Liability Company Act (the Act), K.S.A. 17-7601 *et seq.*

The Simpson Investment Company, L.C. (Company) members were deadlocked on important management issues. Several members withdrew to effect dissolution of the Company. The parties dispute whether these withdrawing members may now participate

in dissolution, including liquidation of the Company's assets. The issue is control of dissolution. Both family factions rely on the Company's operating agreement to support their positions. The plaintiffs are the withdrawing Simpsons. The defendant Company is comprised of the remaining Simpsons.

Our jurisdiction is under K.S.A. 20-3018(c), a transfer from the Court of Appeals on our own motion.

The plaintiffs, as appellants, present three questions for review: (1) Does the operating agreement allow the withdrawing members to participate in dissolution? (2) Were the withdrawing members justified in assuming they could participate in the liquidation when they made their decision to withdraw? and (3) Is the alleged "intransigence and incompetence" of the remaining members a genuine issue of material fact requiring an evidentiary hearing on the appointment of a receiver?

The district court, in entering partial summary judgment for the Company, held that dissolution is properly controlled by the defendant Company and its remaining members. Under the district court's ruling, the withdrawing Simpsons are no longer members of the Company. No finding was made on plaintiffs' contention that the current members of the Company are not competent to control dissolution, and no receiver was appointed.

We recast the three presented questions into the one dominant issue: Who is to control the Company's dissolution? The answer is, the Company. The district court did not err in refusing to appoint a receiver. However, we disagree with the district court's definition of "members." The withdrawing members, whose action triggered dissolution, remain "members" during dissolution.

## FACTS

The Company was formed in 1991 by two brothers, Donald and Alfred Simpson, to manage various land holdings of the Simpson family.

The operations of the Company are governed by an Amended and Restated Operating Agreement (operating agreement). Presently, the sole asset of the Company is 104 acres of commercial property in Johnson County. The Simpson family has held this land

since 1941. Its worth is estimated at over $10 million. Donald and Alfred created several trusts for the benefit of their respective family members and themselves. These trust entities comprise the membership of the Company. (All members but one, Investcorp, L.P., are trusts.)

The Donald Simpson family (the remaining Simpsons) hold a 50% ownership, and the Alfred Simpson family (the withdrawing Simpsons and the Christopher A. Moran Trust [Moran Trust]) hold the other 50%. The Moran Trust, Mark Simpson, trustee, is aligned with the Alfred Simpson family but did not withdraw. The election of the Moran Trust to remain was strategically significant. Section 9.3 of the operating agreement required unanimous consent of the remaining members to continue the Company when dissolution is initiated by a member's resignation. The Moran Trust did not consent to continue the Company. The result was dissolution.

Three managers of the Company, Donald Simpson, Alfred Simpson and Mark Simpson, were designated in the Articles of Organization. At some point Reed Simpson also became a manager. Reed is Donald's son and Mark is Alfred's son. At oral argument plaintiffs' counsel identified the managers when deadlock occurred:

"One manager was within my group of the withdrawing members. One manager was within the other group with the remaining members. And I think there was a third who was a member of the remaining [group]. So two out of three managers were in the remaining group and one was in the withdrawing group."

Each family had contradictory ideas about the disposition of the 104 acres. The plaintiffs claim they attempted to resolve the stalemate, offering, among other things, to divide the property. The operating agreement does not allow partition. It provides: "No member shall have any right to seek or obtain a partition of the Property or other assets of the Company, nor shall any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company."

Family differences were not resolved. Alfred's family (spearheaded by Mark) decided to force dissolution by withdrawing as members. They did so according to the terms of the operating

agreement, which directed that any member could resign after giving 6 months' notice. The withdrawing members noticed their resignations on April 10, 1996.

Under the operating agreement, the Company could elect to purchase a withdrawing member's interest. The remaining members (the Donald Simpsons plus the Moran Trust) declined to do so. The Company refused to proceed with dissolution even though the operating agreement required unanimous consent to continue. The withdrawing members then sued the Company seeking dissolution and appointment of Mark Simpson as receiver.

The district court ruled that the Company was dissolved because unanimous consent by the remaining members to continue was not obtained. The Company had argued that the Company was not dissolved because a majority in interest of the remaining members had agreed to continue the business. The district court, in ordering dissolution, relied on the version of K.S.A. 17-7622(a)(3) existing in 1991 when the Company was formed. Under that statute, consent of all remaining members was required to continue the Company unless the articles of organization otherwise provided a right to continue. K.S.A. 17-7622(a)(3) was amended in 1995 to permit an LLC to continue by consent of a majority in interest of the remaining members. L. 1995, ch. 245, § 16. The Company contended that the withdrawing members had no right to participate in dissolution because they were no longer members of the Company. The district court agreed. The withdrawing members protested that the remaining members were unwilling and incompetent to dispose of the property. The district court declined to rule on whether a receiver should be appointed due to the claimed "intransigence and incompetence" of the remaining members. This appeal followed.

## DISCUSSION

Our primary question is who controls dissolution of the Company. We are involved in the construction of the operating agreement and the Act; thus, we have unlimited review. See *Beverly v. McCullick*, 211 Kan. 87, 96, 505 P.2d 624 (1973). We are also reviewing a summary judgment. The rules controlling summary

judgment are well known and referenced frequently. See K.S.A. 1998 Supp. 60-256; *Isnard v. City of Coffeyville*, 260 Kan. 2, 4, 917 P.2d 882 (1996).

We first examine the operating agreement. A key section provides:

"9.2 Effect of Dissolution. Except as provided in Section 9.3 below, upon the dissolution of the Company, *the Members* shall proceed to wind up, liquidate and terminate the business and affairs of the Company. In connection with such winding up, *the Members* shall liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining a fair value therefor, satisfy and compromise the liabilities of the Company (which may include the establishment of reasonable cash reserves for any contingent or unforeseen liabilities of the Company), make distributions, in cash or in kind, *to the Members* and do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation." (Emphasis added.)

The district court construed Section 9.2 as excluding the withdrawing members from participating in dissolution. The district judge looked to the definition of "Members" in the operating agreement. Members are defined as "those persons who are members of the Company from time to time, including any Substitute Members." The judge noted that under Kansas law, the phrase "from time to time" has been defined as meaning "at intervals" or "as occasion may arise." (Citing *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 898 P.2d 1145 [1995].) He reasoned, "This clearly indicates that the term "Members" as used in Section 9.2 of the Operating Agreement is to be construed as meaning the members of the Company as of the relevant time of examination of the document. That time is now . . . ."

The district judge's order granting partial summary judgment to the Company provides insight into the nature of the controversy:

"The Defendant has argued that the Company and its Members are to control dissolution, pursuant to the terms of the Operating Agreement and the Act. The Plaintiffs have argued that no current Member has the necessary qualifications to wind up the affairs of the Company, have argued that a receiver should be appointed to control dissolution, have argued that the term "Members" in section 9.2 of the Operating Agreement includes the Plaintiffs although they have resigned and withdrawn as members, and have argued that since former members

are "Members" within the meaning of section 9.2, there is a deadlock on all issues, warranting appointment of a receiver.

"On May 19, 1997, the Court ruled from the bench that, with respect to the issue of who should control dissolution of the Company, there is no genuine issue of material fact, summary judgment on this issue is proper, and partial summary judgment should be entered in favor of Defendant. The Company and its current Members (excluding Plaintiffs, who have resigned as members) are entitled to control dissolution pursuant to the following findings of fact and conclusions of law. The Court did not decide, and did not intend to decide, Plaintiffs' claim that the current Members of the Company are not competent to control dissolution of the Company."

The conclusions of law included:

"6. The Members are specifically authorized by this Order to preside over dissolution of the Company; and are specifically required, *through the proper managers of the Company* or otherwise, and pursuant to Section 9.2 of the Operating Agreement and pursuant to K.S.A. 17-7623 and 17-7624, to do all things and acts in connection with dissolution of the Company, including but not limited to [performing the listed dissolution duties set out in K.S.A. 17-7623; 17-7624(a), (b), (c)(1), (c)(2), (c)(3) and (c)(4); 17-7625; 17-7626; and 17-7627]." (Emphasis added.)

The Company maintains that: (1) the district court's decision is consistent with both the operating agreement and the Act, (2) on dissolution, the "Members," as that term is used in section 9.2, means those who are current members, not former members, (3) under the Act, it is the Company itself that is responsible for carrying out matters of dissolution (citing K.S.A. 17-7624 and stating that the Company shall wind up its business, collect and dispose of its assets, and discharge its liabilities.), and (4) this statutory language supports the district court's conclusion that former members are no longer part of the Company.

The plaintiffs counter by arguing *TMG* does not apply here because a surety agreement was at issue in *TMG*. Although a surety agreement was at issue there, the Court of Appeals' analysis applied general rules of contract construction. *TMG* states: "The wording 'from time to time outstanding' in a contract means as occasion may arise, at intervals, or now and then occasionally." 21 Kan. App. 2d 234, Syl. ¶ 8.

The plaintiffs, after questioning reliance on *TMG*, argue the district court's definition of members does not apply to them. Plaintiffs assert:

"It is equally obvious that in paragraph 9.2 the Operating Agreement was referring to Members as of a *relevant* time period. Members in 1993 who may have long ago relinquished their interest in the Company are not the Members to which Section 9.2 refers. So Section 9.2 does not refer to every single former Member."

The plaintiffs reason anyone who withdrew before them and has no economic interest would not be allowed to participate, but that they should because they caused the dissolution and still have an economic interest. Plaintiffs' economic interest rationale interprets Section 9.2 to include some "former members" but not others.

The plaintiffs advance four arguments of construction that they believe signal an interpretative error by the district court: (1) Section 9.2 does not differentiate between "remaining members" and "former members." According to the plaintiffs, if the operating agreement had intended that only "remaining members" could participate in liquidation, the agreement would have said so. (2) Section 9.2 uses only the term "Members," thus, the logical context of that word includes all members, current and former, who have an economic interest in Company assets. The plaintiffs suggest this conclusion is borne out by examining the last time the word "members" is used in section 9.2 (in a provision stating distributions will be made to all members). (3) The term "remaining members" is used in other sections of the agreement, but was not used in section 9.2. Plaintiffs point to section 9.3 as an example:

"Continuation. Notwithstanding the provisions of Section 9.1 and 9.2 above, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company, shall not cause the Company to be wound up, liquidated or terminated, in the event all of the *remaining Members* unanimously consent to the continuation of the Company." (Emphasis added.)

(4) The word "members" is not used anywhere else in the agreement to refer only to members remaining after the withdrawal of some members. The plaintiffs reason that "members" should include all who have a financial interest in the Company. As to the operating agreement's reference to "from time to time" in defining

members, plaintiffs assert the relevant time is when they elected to initiate dissolution under the Act.

The Company argues that Section 9.2 does not distinguish between former members and current members because it consistently refers only to current members. Here, dissolution was caused by the withdrawing members and one remaining member who did not consent to the continuation of the Company. According to the Company, upon the dissolution, the plaintiffs were no longer members; thus, at the time of the judicially recognized dissolution, the only "members" left to proceed with liquidation were those who did not withdraw.

The plaintiffs direct us to authority from other jurisdictions and the Uniform Limited Liability Company Act (ULLCA), 6A U.L.A. 425 (1995), for guidance. The parties agree that the operating agreement is unambiguous. We are reluctant to agree with those conclusions.

Whether an instrument is ambiguous is a matter of law to be decided by the court. Generally, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction. *In re Estate of Sanders*, 261 Kan. 176, 181-82, 929 P.2d 153 (1996). Here, the parties, in concert, contend the operating agreement must be enforced as written. The plaintiffs say there is no ambiguity because clearly the agreement means what they say it means. With equal vigor, the Company says there is no ambiguity because clearly the agreement means what they say it means. (Here, "meaning," like beauty, is in the eye and interest of the beholder.)

We find only moderate assistance in resolving the question of who may participate in dissolution (winding up) by looking to either the ULLCA or the law of other states. The ULLCA § 803(a) excludes managers or members who dissolved wrongfully. Kansas does not distinguish between wrongful and rightful dissolving members. Some states take the ULLCA approach; however, there is a lack of consensus on the question and states have chosen different courses. See *e.g.*, Ariz. Rev. Stat. Ann. § 29-707(A) (1998) (treating a resigned member as an assignee); Ga. Code Ann. § 14-11-604(a) (1994) (stating the members or managers in control prior

to dissolution may wind up); Md. Corporations and Associations Code Ann. § 4A-904(a) (1998 Supp.) (unless the members have provided otherwise, only "remaining members" may participate in winding up).

Resolution of the Simpson family dispute is fact driven. Each Simpson faction advances a reasonable view of the operating agreement's meaning of "member." However, we are persuaded that the plaintiffs' view should prevail. The use of "remaining Member" in Sec. 9.3 and also in Section 8.7 is significant in view of the fact that the term "remaining Member" is not found in Section 9.2. Section 8.7 says:

"Adjustment of Percentage Interests.

Upon the purchase by the Company of a Selling Member's Interest in accordance with Section 8.5 above, the Percentage Interests of *each remaining Member* shall be adjusted in accordance with the provisions of this Section effective as of the Valuation Date. The Percentage Interest of each *remaining Member* shall be adjusted to that percentage determined by dividing the Percentage Interest of such Member prior to such adjustment by the total Percentage Interest of all Members (other than the Selling Member) prior to such adjustment." (Emphasis added.)

We are required by the cardinal rule of contract construction to determine the parties' intent from the four corners of the operating agreement. We are to construe "all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Metropolitan Life Ins. Co. v. Strnad,* 255 Kan. 657, 671, 876 P.2d 1362 (1994). The parties did not make use of the word "remaining" in Section 9.2, but they did so elsewhere.

The many references to "member" in the Act when coupled with the operating agreement suggest the better view is that, in dissolution, "member" includes a withdrawing member having a financial interest in the Company's assets. For example, we note that Section 4.1 of the operating agreement, entitled <u>Allocations and Distributions</u>, provides in part:

"(b) Liquidation proceeds shall be distributed in the following order of priority:

(i) To the payment of debts and liabilities of the Company (including those to the *Members*) and the expenses of liquidation; then

(ii) To the Managers in payment of the Manager Additional Contributions (if any) and any return thereon; then

(iii) The remainder to *the Members* in accordance with their respective positive Capital Account balances." (Emphasis added.)

Withdrawal as a dissolution trigger is contemplated by the operating agreement. Withdrawal here was proper. The operating agreement defined "members" as "those persons who are members of the Company from time to time, including any Substitute Members." Each plaintiff has a financial interest in the Company. Until dissolution has run its course, plaintiffs are members. The plaintiffs were forced, by the Company's refusal to initiate dissolution, to sue. The Company refused to acknowledge the requirement of its own operating agreement, *i.e.*, upon a member's resignation, the Company could only continue by unanimous consent of all remaining members.

We believe the resolution here is found in the interplay of the Act and the control provisions of the operating agreement. Compensation for all Simpson economic interests is not an issue. The Company does not deny the withdrawing Simpsons their right to be paid once the Company's assets are reduced to cash. The operating agreement places control in "the Managers."

The district court in its June 6, 1997, journal entry ordering dissolution said:

"10. . . . [D]efendant is in dissolution within the meaning of the Kansas Limited Liability Company Act, and within the meaning of the Amended and Restated Operating Agreement, and should immediately take the steps set out in K.S.A. 17-7622(b) *et seq.* to conclude that dissolution, namely:

"A. Immediately execute a statement of intent to dissolve in the form prescribed by the Secretary of State;

"B. Immediately file such statement with the Secretary of State;

"C. Pay all fees and franchise taxes as prescribed in the Kansas Limited Liability Company Act;

"D. Upon the filing with the Secretary of State of a statement of intent to dissolve, cease to carry on its business, except insofar as may be necessary for the winding up of its business; and

"E. Within 20 days after the Company has filed a statement of intent to dissolve, immediately cause notice thereof to be mailed to each creditor of, and claimant against, the limited liability company. The court reserves any ruling upon the issue of who shall liquidate defendant's property pending further hearing."

The Company did not appeal from this order. The district court followed on August 18, 1997, with its second partial summary judg-

ment order. Summary judgment placed control of dissolution in the Company and its current members "through the proper managers of the Company or otherwise." Control in the managers is consistent with K.S.A. 17-7627(b), which provides:

"The certificate of dissolution shall be returned to the representative of the dissolved limited liability company. Upon the issuance of such certificate of dissolution, the existence of the company shall cease, except for the purpose of suits, other proceedings, and appropriate action as provided in the Kansas limited liability company act. *The manager or managers in office at the time of dissolution,* or the survivors of such managers, or, if none, the members, *shall* thereafter be trustees for the members and creditors of the dissolved limited liability company. In such capacity, the trustees shall have authority to distribute any company property discovered after dissolution, to convey real estate and to take such other action as may be necessary on behalf of and in the name of such dissolved limited liability company." (Emphasis added.)

The managers in office at the time of dissolution, October 10, 1996, are responsible for carrying out the acts of dissolution prescribed by the district court. This view is consistent with LLC commentary on the subject. See Callison & Sullivan, Limited Liability Companies, § 10.4, p. 73 (1994); 1 Ribstein & Keatinge on Limited Liability Companies, § 11.08 (1992).

The managers of the Company must dispose of the property and distribute its assets according to K.S.A. 17-7625. The road map for dissolution (the winding up of the Company) has been set by the district court. The managers are to follow that map in a timely manner. The district court did not err by placing control of dissolution in the Company through its managers; however, the plaintiffs, because they have a financial interest in the assets of the Company, are members during dissolution.

The plaintiffs' second issue, that they were justified in assuming they could participate in the liquidation when they made their decision to withdraw, is resolved by our including the plaintiffs as members during dissolution.

## The Receiver Issue

The plaintiffs contend the "intransigence and incompetence" of the remaining members of the Company is a genuine issue of material fact. Upon suing the Company, the plaintiffs requested that

Mark Simpson be appointed as a receiver to oversee dissolution (and if not Mark, then any qualified person other than a member of Donald's family).

On the question of whether a receiver should be appointed, the district judge ruled:

"The competency of the current members of [the Company] to control dissolution of the Company, including liquidation of the real property of the Company in the time frame previously ordered by the Court, is *not* an issue before the Court in the present posture of this case."

The district judge, in his second partial order of summary judgment said,

"Therefore, *at this time,* no receiver shall be appointed to preside over dissolution of the Company." (Emphasis added.)

The Act does not contain a statutory procedure for appointing a receiver. We note that other jurisdictions provide for the appointment of a receiver or trustee by the district court upon "cause shown." See *e.g.,* Ga. Code Ann. § 14-11-604(a) (1994); Me. Rev. State. Ann. tit. 31, § 703(1) (1996).

When the district court ordered dissolution, it required the Company, through its managers, to complete dissolution procedures. Among other things, the Company is to liquidate and reduce its assets to cash as promptly as is consistent with obtaining a fair value therefor. Each Simpson faction submitted affidavits relating to the competency of the remaining members to effectively dispose of the 104 acres.

The plaintiffs argue that the district court erred by not holding an evidentiary hearing on the competence of the remaining members to accomplish the liquidation of the 104 acres. In submissions to the district court, Mark Simpson alleged that the remaining members: (1) lacked the necessary qualifications to proceed with liquidation; and (2) had no incentive to expedite the liquidation. No other allegations were made, and no one other than Mark Simpson made allegations that the remaining members were unfit to carry out the liquidation.

Mark opined, "[T]he remaining Members are not capable of selling the assets for fair market value within the time frame re-

quired by the Operating Agreement." According to Mark, "The remaining Members have repeatedly demonstrated a total lack of sophistication, understanding and ability to effectively and responsibly deal with any potential buyer." Mark insisted the remaining members had rejected commercially reasonable transactions. Mark believed only he had the necessary experience as a real estate broker to efficiently dispose of the property.

Both Donald and Reed (father and son in the faction opposing Mark) related their desire to hire an independent third-party broker to market the property and find a buyer. Donald explained that he and his brother, Alfred, agreed to hold the property together. The idea was to develop one parcel and sell when the surrounding area was in an optimum stage of development. Donald stated they could have sold the property in 20- or 40-acre tracts long ago. They declined to do so because they wished to wait until a planned project for development was in reach. Donald concluded by saying he agreed that the time had come to make serious efforts to sell the land.

Reed described the business sophistication of the Donald Simpson family in a second affidavit. He explained that Donald was 69 years old, with 50 years of experience in finance, business, insurance, and real estate. Nina Simpson (a co-trustee of several Company trust members) was 37 years old, with a BS in business from Kansas University and a masters in Business Administration from Dartmouth. Her career has been in banking, working at the Federal Reserve in Kansas City, and at MBNA in Baltimore, Maryland, in the area of commercial real estate lending. Marshal Simpson (a trust beneficiary) was 39 years of age, with a BA in Economics from the University of Missouri at Kansas City. He made his career as a commercial real estate mortgage broker and is the owner of Union Commercial Mortgage of Kansas City. Finally, Reed himself has a BS in Business Administration from the University of Arizona and a Masters degree in architectural management from Kansas University. He explained that his career in business, banking and real estate spanned 20 years. He currently has the responsibility for commercial investment real estate for a brokerage firm in the Kansas City area.

The record reflects that after the district court's order to proceed with dissolution, the Company did engage professional third-party brokers to sell the 104 acres.

The district court heard some evidence on liquidating the real estate after Plaintiffs filed their notice of appeal. Richard Baier, a professional broker with C.B. Richard Ellis, testified he was engaged by the Company to market the property in 1997. According to Baier, the Company timely responded to all offers. John Sweeney, of Terra Venture, Inc., engaged to assist in the retail marketing of the property, also testified. He testified his firm was actively marketing the property both as one parcel and as subparcels and pad sites.

We note the district court, in ruling that the competency of the current members of the Company is not an issue, prudently said: "The Court, by so ruling, does not mean to preclude any future review by this Court or any court of the compliance by the current members of Simpson Investment Company, L.C., with any order of this Court."

The district court did not err by failing to hold a full evidentiary hearing on the issue of the remaining members' alleged "incompetence and intransigence." The plaintiffs' allegations are minor accusations based on the subjective conclusions of Mark alone. Even if proved, Mark's allegations are insufficient to justify the appointment of a receiver. There were neither allegations of fraud, breach of fiduciary duty, or waste, see *Browning v. Blair*, 169 Kan. 139, 145, 218 P.2d 233 (1950), nor a showing of "good cause." The plaintiffs failed to produce a single compelling or constructive reason for the appointment of a receiver. The district court did not err by refusing to further entertain the plaintiffs' request.

Affirmed in part, reversed in part, and remanded: (1) The Company through its manager trustees controls dissolution, (2) the plaintiffs are "members" of the Company during dissolution, and (3) refusing to appoint a receiver was not error. On remand, the district court has jurisdiction to monitor its previous orders as modified by this opinion and to consider any appropriate future matters that may arise concerning the Company's dissolution.