No. 89,518

INVESTCORP, L.P., *et al., Appellants,* v. SIMPSON INVESTMENT COMPANY, L.C., *Appellee.*

(85 P.3d 1140)

Opinion filed March 19, 2003.

*Mick Lerner,* of Law Office of Mick Lerner, P.A., of Overland Park, argued the cause and was on the briefs for appellants.

*John L. Vratil,* of Lathrop & Gage, L.C., of Overland Park, argued the cause and *Jeffrey R. King,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This case involves a dispute over attorney fees and other expenses between two factions of the Simpson Investment Company, L.C. (Company), a Kansas limited liability company. One faction primarily consists of six members who withdrew from the Company, and the other faction consists of four of the five members who remained. The district court denied the withdrawing members' motion for declaratory judgment which requested that they not be required to share in paying expenses incurred by the Company totaling approximately $240,000. The withdrawing members appealed, and we transferred the case from the Court of Appeals on our own motion pursuant to K.S.A. 20-3018(c).

The parties raise a total of 11 arguments in their briefs which surround the main issue: Who is to pay for the expenses? The answer is, the Company, *i.e.*, all of its members, including those who withdrew. Consequently, the judgment of the district court is affirmed.

FACTS

*Background*

These factions have brought their disputes to this court once before. An excellent background is provided in *Investcorp, L.P. v. Simpson Investment Co., L.C.*, 267 Kan. 840, 983 P.2d 265, *modified* 267 Kan. 875, 983 P.2d 265 (1999) (*Investcorp I*). A recapitulation, however, is necessary to understand the present controversy.

Company was formed in 1991 by two brothers, Donald and Alfred Simpson, to manage various land holdings of the Simpson family. Donald and Alfred, together with Alfred's son Mark Simpson, were eventually selected as managers.

The operations of the Company are governed by an Amended and Restated Operating Agreement (operating agreement). Presently, the sole asset of the Company is 104 acres of commercial property at the northeast corner of 135th Street and Pflumm in Johnson County. It has been held by the family since 1941 and is estimated to be worth over $10 million. Donald and Alfred created several trusts for the benefit of their respective family members

and themselves. These trust entities comprise the membership of the Company. (All members but one, Investcorp, L.P., are trusts.)

The two Simpson families had contradictory ideas about the disposition of the 104 acres. Since the family differences were not resolved, Alfred's family (spearheaded by Mark) decided to force dissolution of the Company by withdrawing as members. The withdrawing members were Investcorp, L.P. (Kansas limited partnership), the Kimberly S. Markey Trust, the Kelly S. Moran Trust, the Marty Aarreberg Trust, the Marshall A. Moore Trust, and the Shauna S. Simpson Trust. Together with one remaining member, the Christopher A. Moran Trust, the withdrawing members owned approximately 50% of the Company. They gave notice of their resignations on April 10, 1996, which became effective 6 months later per the operating agreement.

The remaining members were those from Donald's family — the Nina S. Boyd Trust, the Jana E. Simpson Trust, the Reed A. Simpson Trust and the Marshall T. Simpson Trust — and one actually aligned with Alfred's family, the Christopher A. Moran Trust, for which Mark Simpson served as trustee. The remaining members, from Donald's family, owned approximately 50% of the Company.

After the resignations, the Company refused to proceed with dissolution, even though the operating agreement required unanimous consent of the remaining members to continue, and the Christopher A. Moran Trust did not consent to continuation. The withdrawing members then sought dissolution by suing the Company on October 15, 1996, only 5 days after their resignations became effective. They also sought appointment of Mark Simpson as receiver to preside over the resultant liquidation and distribution of assets and further sought recovery of their attorney fees and costs.

After the district court reviewed competing motions for summary judgment, it filed its journal entry on June 6, 1997, granting partial summary judgment to the withdrawing members because unanimous consent of the remaining members to continue the Company had not been obtained. It therefore determined that the Company "is in dissolution . . . and should immediately take the

steps . . . to conclude that dissolution." The Company did not appeal this ruling.

On August 18, 1997, the district court filed its journal entry granting a partial summary judgment to the Company. It denied the withdrawing members' request to appoint a receiver and placed control of dissolution in the Company and its current members — which specifically excluded the withdrawing members — "through the proper managers of the Company or otherwise." The withdrawing members appealed this latter order as well as one dated February 6, 1998, in which the district court refused to conduct an evidentiary hearing regarding the competence and trustworthiness of the remaining members to carry out the dissolution order.

On July 16, 1999, this court affirmed in part, reversed in part, and remanded. In reversing the district court and holding that the withdrawing members remained Company members during dissolution, we relied upon the language of the operating agreement chosen by the parties, particularly section 9.2 captioned *Effect of Dissolution*. This court concluded that because other sections of the operating agreement, *i.e.*, sections 8.7 and 9.3, specifically refer to remaining members, and section 9.2 does not, then 9.2 applies to all members, including those who have withdrawn. 267 Kan. at 848. Contained in our holding was an acceptance of the withdrawing members' argument that "member" includes a withdrawing member having a financial interest in the Company's assets. 267 Kan. at 846, 848, 850.

After each party filed a motion to modify under Supreme Court Rule 7.06 (2003 Kan. Ct. R. Annot. 52), and the Company sought rehearing, we denied the motion for rehearing but modified the original opinion. See *Investcorp, L.P. v. Simpson Investment Co., L.C.*, 267 Kan. 875, 983 P.2d 265 (1999). This court then held:

"(1) The Company through its manager trustees controls dissolution, (2) the plaintiffs [withdrawing members] are 'members' of the Company during dissolution, and (3) refusing to appoint a receiver was not error. On remand, the district court has jurisdiction to: (a) monitor its previous orders as modified by this opinion, (b) decide who the managers are to control dissolution, and (c) consider any appropriate future matters that may arise concerning the Company's dissolution, including the appointment of a receiver, if either the requirements of *Browning v. Blair,* 169 Kan. 139, 218 P.2d 233 (1950) (fraud, breach of fiduciary duty, or

waste) or a showing of good cause have been met and the interests of all members will best be protected by the appointment of such receiver." 267 Kan. at 877.

*Present Controversy*

The present controversy concerns certain Company expenses incurred from October 21, 1996, through May 30, 2002, which obviously includes the time the case was on appeal before this court, *i.e.*, March 13, 1998, to October 29, 1999. According to the withdrawing members, the expenses generally included certain attorney fees and costs related to the Company's defense of the lawsuit; interest and other expenses regarding a Company loan; and certain marketing, surveying, and miscellaneous expenses. The expenses totaled approximately $240,869. The withdrawing members allege that almost all of the expenses were incurred after December 20, 1996, when the remaining members voted to remove Alfred and Mark as managers, retained Donald, and added Donald's son Reed as a manager.

The expenses, other than attorney fees of approximately $175,000, included attempts to find a purchaser or purchasers for the property. They also included payment of principal and interest on funds drawn against a $245,000 line of credit for Company expenses with First National Bank of Kansas. This line of credit was authorized by the December 22, 1997, vote at a meeting of the remaining members and secured by a mortgage on part of the property, the Company's only asset. Mark Simpson attended the meeting and objected to the proposed action.

The attorney fees were primarily incurred by the Company when it defended the litigation in the district court. These efforts included, but were not limited to, answering the October 15, 1996, lawsuit; responding to the plaintiffs' motion for a temporary restraining order filed in April 1997, which sought to preclude the Company from incurring any liquidation expenses; and responding to plaintiffs' motion to enforce judgments filed July 17, 1998, while the case was on appeal and ultimately journalized on June 30, 2000 (journal entry re plaintiffs' motion to enforce judgments) after our decision in *Investcorp I.*

The attorney fees were also incurred by the Company when it filed a motion for declaratory relief in April 2000 and responded to plaintiffs' cross-motion for declaratory relief filed June 27, 2000, which resulted in the court's memorandum ruling on opposing motions for declaratory judgment dated January 8, 2002, denying both motions.

The attorney fees were also incurred by the Company when it responded to the May 30, 2002, motion for limited declaratory relief filed by the withdrawing members. There, they asked the court to order that they not be required to share in paying the expenses incurred by the managers, Donald and Reed, and that the remaining members who had selected these managers should alone bear the loss. The district court denied the motion in a memorandum order on August 6, 2002, which it modified on September 20, 2002.

According to the withdrawing members' notice of appeal, they appeal only from the August 6, 2002, memorandum order, as later modified.

ANALYSIS

According to the withdrawing members' position repeatedly stated to the district court, both in their motion for limited declaratory relief and oral arguments supporting that motion, they did not challenge the reasonableness of the expenses or that the expenses were properly attributable to the Company. Rather, they argued that they simply should not have to share in these expenses. They acknowledge the effect of their argument requires that the remaining members, who constitute approximately 50% of the ownership, pay 100% of these expenses from their share of the eventual distribution of Company assets.

In the journal entry from which the withdrawing members appeal, the district court cited excerpts from their motion to essentially acknowledge their concession about the propriety of the Company expenses. The court then held that the withdrawing members and the remaining members should all share in those Company expenses. Although the withdrawing members do not expressly state their concession in their appellate briefs, our anal-

ysis proceeds from that basic concession. See *Mater v. Boese*, 213 Kan. 711, 720, 518 P.2d 482 (1974) (appellants barred from taking position inconsistent with position they took before the trial court prior to appeal).

Our review of their basic argument, that they simply should not have to share in these Company expenses, requires us to apply, where relevant, our holdings in *Investcorp I*, 267 Kan. 840. However, our review is unlimited when we next examine the district court's legal conclusions, the parties' operating agreement, and the Kansas Revised Limited Liability Company Act, K.S.A. 2003 Supp. 17-7662 *et seq.*, (KRLLCA or Act), which is retroactively applicable to all Kansas limited liability companies (LLCs), regardless of when formed (see K.S.A. 2003 Supp. 17-76,140); *Investcorp I*, 267 Kan. at 843 (citing *Beverly v. McCullick*, 211 Kan. 87, 96, 505 P.2d 624 [1973]).

Issue 1: *Is the law of the case doctrine determinative?*

As a threshold matter, the Company essentially argues that the issue of the expense attribution to all members had been decided against the withdrawing members in this case years ago. They specifically reference the district court's journal entry re plaintiffs' motion to enforce judgments filed June 30, 2000. More important, according to the Company, the withdrawing members' failure to appeal that journal entry within 30 days of its filing in accordance with K.S.A. 60-2103(a) was a waiver of that right. As a result, the Company argues the findings and conclusions contained in that journal entry became the law of the case (citing *Martinez v. Roscoe*, 100 F.3d 121 [10th Cir. 1996]).

The withdrawing members respond that the June 30, 2000, journal entry simply memorialized findings and conclusions the district court had made in a letter to counsel in February 8, 1999, while the case was on appeal with this court. Consequently, according to the withdrawing members, that journal entry was rendered moot by this court's eventual decision in *Investcorp I*.

We begin by examining the journal entry which states in relevant part:

## Conclusions of Law

"81. The Court's Order of August 18, 1997, requires the Company to: 'convey and dispose of the assets of the Company (pursuant to K.S.A. 17-7624(c)(2)) and liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining a fair value therefore (pursuant to section 9.2 of the Operating Agreement)'; and 'do all other acts required to liquidate the business and affairs of the Company (pursuant to K.S.A. 17-7624(c)(4)).'

"82. Plaintiffs, as the moving parties, have the burden of proving by a preponderance of the evidence that defendant has failed to comply with the Order of August 18.

"83. The Court concludes that plaintiffs have failed to meet their burden of proving that defendant failed to comply with the Order of August 18.

"84. A preponderance of the evidence indicates that defendant has immediately proceeded with the process of liquidating the Property; it has **not** stalled that process.

. . . . .

"87. The Company's engagement of Koll (now C.B. Richard Ellis) and Terra Venture to market the Property is appropriate and in compliance with the Order of August 18.

"88. The Company's engagement of BNIM Architects to revise the master plan and prepare a marketing brochure for the Property is appropriate and in compliance with the Order of August 18.

"89. The Company's engagement of Appraisal Associates to perform a study of the highest and best use of the Property and to appraise the Property is appropriate and in compliance with the Order of August 18.

"90. Obtaining a survey of the retail portion of the Property is appropriate and in compliance with the Order of August 18.

"91. It is appropriate for the Company to retain and pay attorneys to represent its interests in this litigation.

"92. It is appropriate for the Company to borrow money and secure the loan with a mortgage on the Property, in order to pay operating expenses of the Company.

"93. Activities of the real estate brokers retained by the Company to market the Property are appropriate and in compliance with the Order of August 18.

. . . .

"104. The Court concludes that, as of this date, defendant has fully complied with the Order of August 18, 1997.

"105. The Court concludes that plaintiffs are not entitled to the relief requested."

We disagree with the Company for several reasons. First, the journal entry only determines that the expenses are appropriate for

the Company, a propriety the withdrawing members do not dispute. Contrary to the Company's suggested interpretation, the journal entry does not contain a determination that the withdrawing members will share in those expenses.

Second, even if the journal entry were interpreted in such a way, the question becomes whether it was appealable within 30 days under K.S.A. 60-2103. In *Brower v. Bartal,* 268 Kan. 43, 46, 990 P.2d 1235 (1999), we held that K.S.A. 60-2102 also applies to this court. For our court to have jurisdiction of an appeal filed within 30 days of the filing of that journal entry, it therefore had to be either a "final decision" under 60-2102(a)(4) or an interlocutory order under 60-2102(b). We conclude it was neither.

We initially observe that the district court did not make the requisite written findings to qualify as interlocutory under 60-2102(b). See *Brower,* 268 Kan. at 46. We next observe the district court did not use language that would suggest the journal entry was a "final decision" under 60-2102(a)(4) as it had done in other journal entries in the instant case. For example, in the February 6, 1998, journal entry from which the withdrawing members had originally appealed, the court had stated, "this resolves all claims and issues in this case and all prior orders of this court now are subject to appeal."

The district court had used language of similar import in its August 6, 2002, memorandum opinion from which the present appeal is taken. It stated:

"This Memorandum Decision, when signed by the Judge and filed with the Clerk, shall constitute the judgment of the Court. The Clerk is requested to serve a copy of this Order on the attorneys of record within three (3) days from the filing of same with the Clerk all as provided by K.S.A. 60-258."

We acknowledge the district court's language or even its determination of finality is not dispositive of the appealability issue. See *Plains Petroleum Co. v. First Nat'l Bank of Lamar,* 274 Kan. 74, 83, 49 P.3d 432 (2002). Nevertheless, the district court's apparent treatment of the subjects, coupled with the fact that (1) the case was before this court on appeal at the time the district court had made its February 1999 decision in a letter to counsel, though not

journalized until after this court's decision later that year; (2) the court still had pending before it the parties' cross-motions for declaratory relief; plus (3) the parties continued to file numerous pleadings (*e.g.*, plaintiffs' motion for limited declaratory relief), after June 30, 2000, all strongly support the conclusion that the June 30, 2000, order was not final and therefore not appealable in July 2000.

As we stated in *Honeycutt v. City of Wichita,* 251 Kan. 451, 457, 836 P.2d 1128 (1992):

"In *Gulf Ins. Co., v. Bovee,* 217 Kan. 586, 587, 538 P.2d 724 (1975), this court said:

'No definition of "final decision" is contained in the statute [60-2102(a)(4)] but this court has previously construed it to mean, "one which finally decides and disposes of the entire merits of the controversy, and reserves no further questions or directions for the future or further action of the court." *Bates & Son Construction Co. v. Berry,* [217 Kan. 322, 324, 537 P.2d 189]; *Cusintz v. Cusintz,* 195 Kan. 301, 302, 404 P.2d 164. See also *Connell v. State Highway Commission,* 192 Kan. 371, 388 P.2d 637.'

See 6 Vernon's Kansas C. Civ. Proc. § 60-2102, Author's Comments, § 2102.2 (1967) and 2 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-2102, Comments (1979). In Gard, the author commented that a " 'final decision" . . . is really self-defining. Obviously it is an order which definitely terminates a right or liability involved in the action, or which grants or refuses a remedy as a terminal act in the case.' "

Since we hold the June 30, 2000, journal entry was not appealable within 30 days under K.S.A. 60-2102(a)(4), the withdrawing members did not possess a right to appeal that they could have waived at that time. Accordingly, *Martinez v. Roscoe,* 100 F.3d 121 (10th Cir. 1996) does not apply. There, the Tenth Circuit Court of Appeals applied the doctrines of waiver and law of the case because of a party's failure to appeal from a federal court's years-earlier issuance of a permanent injunction. By comparison, such an injunction would have been immediately appealable as a matter of right under Kansas law. See K.S.A. 60-2102(a)(2).

The issue of whether the withdrawing members must share in the Company expenses is properly before this court since it was expressly addressed in the journal entry of August 6, 2002, from which the withdrawing members have timely appealed.

Issue 2: *Who must pay the expenses?*

During our review of the district court's holdings in favor of the Company, we are guided by our decision in *Investcorp I* and by the KRLLCA, but primarily by the language in the Company's operating agreement. We obviously must also consider other events in the case which have occurred since our decision in *Investcorp I*. Moreover, as in that case, the law of other states is only of moderate assistance. For these reasons, resolution of the latest Simpson family dispute is again fact driven. See 267 Kan. at 847-48. Our decision is therefore limited to the parties and factual situation before us. See *State ex rel. Schneider v. City of Kansas City,* 228 Kan. 25, 33, 612 P.2d 578 (1980).

We begin by reviewing our decision in *Investcorp I*. The essence of our decision was that though the district court did not err by placing control of dissolution in the Company through its managers, the withdrawing members — primarily because they have a financial interest in the assets of the Company — continued as members during dissolution. See 267 Kan. at 848, 850. As a result, they ordinarily would be subject to the same conditions of membership as the remaining members. This would include, upon dissolution and winding up, entitlement to distribution from remaining assets, but only after all payments to creditors in satisfaction of liabilities of the Company have first been made. See K.S.A. 2003 Supp. 17-76,119(a). The withdrawing members argue, however, this court should find a deviation from this general rule under the circumstances of this case. According to them, the remaining members should pay all these expenses by having these amounts deducted from their share of the eventual distribution of Company assets.

We next observe that under the Act, operating agreements are of great importance. According to one commentator, "[t]he KRLLCA, continuing and extending the philosophy of its predecessor, is largely a set of default rules, subject to change by the operating agreement. It is this legislative philosophy that gives the LLC form one of its three most important features — flexibility." Hecker, *The Kansas Revised Limited Liability Company Act,* 69

J.K.B.A. 16, 20 (Nov.-Dec. 2000). Indeed, K.S.A. 2003 Supp. 17-76,134(b) provides: "It is the policy of this act to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."

In other words, the Act generally authorizes substantial powers. See K.S.A. 2003 Supp. 17-7668 ("A limited liability company shall possess and may exercise all the powers and privileges granted by this act or by any other law . . . together with any powers incidental thereto."). The members of the LLC, however, may accept, reject, or modify many of the Act's provisions in their operating agreement, with a few exceptions. See Hecker, *The Kansas Revised Limited Liability Company Act,* 69 J.K.B.A. at 20 (listing subjects that may be affected by provisions in the operating agreement).

Company members, though the facts in *Investcorp I* established they are sophisticated in business affairs, failed to provide in their operating agreement for the specific factual situation that they have created. By contrast, the KRLLCA invites them to do so. See K.S.A. 2003 Supp. 17-7688(b)(operating agreement may change the general rule regarding member's nonliability for LLC debt to provide that a member or manager may agree to be obligated personally for any or all of the debts, obligations, and liabilities of the company); K.S.A. 2003 Supp. 17-2003 76,134(c)(2) (Member's or manager's or other person's duties and liabilities may be expanded or restricted by provisions in an operating agreement); K.S.A. 2003 Supp. 17-7691 and K.S.A. 2003 Supp. 17-7696 (operating agreement may subject managers and members alike to specified penalties or specified consequences upon the happening of events specified in the operating agreement, or who fail to perform in accordance with, or to comply with, the terms and conditions of the operating agreement).

Nevertheless, the withdrawing members argue various sections of the operating agreement can apply to their factual situation, generally Article VI, MANAGEMENT AND CONTROL. It provides in relevant part:

"6.1 Designation of Managers. The Managers of the Company shall be those persons designated as such in the Company's Articles of Organization, each of whom shall serve until he resigns or is removed from such position. The Managers,

or either of them, may be removed from such position at any time, with or without cause, by the vote of a Majority in Interest in favor of such removal. Any vacancy that may occur in the Manager positions shall be filled by a Member appointed or elected by a Majority in Interest.

"6.2 General Powers of Managers. Except as otherwise provided herein, the right and authority to manage, direct, control and conduct the day-to-day business and affairs on behalf of the Company shall be vested exclusively in the Managers, and all decisions effecting or to be made by, and all actions to be taken and obligations to be incurred on behalf of, the Company shall be made, taken or incurred by any Manager. Any decision or act of any Manager within the scope of his power and authority granted hereunder shall control and shall bind the Company.

"6.3 Actions Requiring Joint Decision of Managers. Notwithstanding the foregoing, the following actions may only be taken by a Manager on behalf of the Company upon the Agreement of a majority in number of the Managers:

. (i) the purchase . . . or the sale . . . or the creation of any lien . . . upon . . . (B) any real property;

(ii) the creation of any obligation . . . in excess of $500;

. . . .

"6.4 Limitation of Powers of Managers. Notwithstanding anything herein to the contrary, the Managers shall not take any action or engage in any transaction not in the ordinary course of business without first obtaining the approval of a Majority in Interest. In determining whether a transaction is 'not in the ordinary course of business,' the Members recognize that the purposes of the Company include developing and selling the Real Property. Accordingly, the sale or other disposition of any real estate by the Company shall not be considered 'not in the ordinary course of business' unless it constitutes a sale of all or substantially all of the Real Property pursuant to a single transaction.

"6.5 Powers of Other Members. No Member, other than the Managers, shall have any right or authority to enter into agreements, execute contracts or other instruments, incur obligations or otherwise bind or act for, in the name and on behalf of the Company in any manner, unless authorized to do so by a Majority in Interest.

"6.6 Liability of Managers. Except in the case where Managers are guilty of fraud, gross negligence, misconduct or reckless disregard of duty, the Managers shall not be liable to the Company or to any other Member for any loss, damage, liability or expense suffered by the Company or any other Member on account of any action taken or omitted to be taken by him as a Manager.

"6.7 Indemnification.

(a) Except as provided in Section 6.6 above, each Member, including the Managers, shall indemnify and hold the Company and the other Members harmless from and against any loss or damage incurred by it or them as a result of any agreement, contract, instrument, obligation or act legally binding the Company

that was incurred or performed by such Member outside the scope of the authority granted to such Member pursuant to this Agreement.

(b) Except as otherwise contrary to the provisions of Section 6.6 or Section 6.7(a) above, each Member shall be indemnified by the Company against any liability, judgment, fine, amount paid in settlement, cost and expense (including attorneys' fees) asserted or threatened against and incurred by such Member in his capacity or arising out of his status as a Member, if such Member acted in good faith and in a manner he reasonably believed to be in the best interests of the Company and provided that such Member has not committed fraud, gross negligence or reckless disregard of duty with respect thereto."

According to the withdrawing members' brief, they rely upon section 6.2, and the concept of ultra vires which they contend is found in sections 6.3 and 6.4. They argue no other provisions of the operating agreement need be considered to grant them relief from sharing in the expenses.

For their argument regarding section 6.2, they point to the last sentence: "Any decision or act of any Manager within the scope of his power and authority granted hereunder shall control and shall bind the Company." They claim that by negative implication, acts *outside* the scope of a manager's power and authority shall not control and bind the Company. They then argue that if such wrongful acts do not bind the Company, the resulting expenses cannot be imposed upon the withdrawing members. The problem with this argument based upon 6.2 is they do not dispute that the incurred expenses are binding Company obligations. As a result, they argue based upon a point that they have already conceded; their resultant argument must therefore fail.

For their argument regarding sections 6.3 and 6.4, they claim these provisions preclude the Company from incurring expenses without a majority of the Managers agreeing to them and without a majority-in-interest of the members approving them. Among other things, they point out that the withdrawing members had not been included in the vote (1) removing Alfred and Mark as managers and (2) electing Reed who, together with fellow "rogue manager" Donald, had incurred the expenses. They then argue that under the ultra vires doctrine, these roguish acts do not bind the Company and the resulting expenses cannot be imposed upon the withdrawing members.

The problem with the withdrawing members' argument based upon sections 6.3 and 6.4 is, once again, that they do not dispute the incurred expenses are binding Company obligations. Accordingly, they again argue based upon a point that they have already conceded; their resultant argument must therefore fail.

The withdrawing members' ultra vires argument fails for additional reasons.

According to the authority they cite: "The term 'ultra vires' means beyond the power. An ultra vires act or contract is one that is beyond the powers expressly or impliedly conferred upon a corporation. *The act must be beyond the powers of a corporation as defined by its charter and the law.*" (Emphasis added.) 18B Am. Jur. 2d, Corporations § 2009. Even if we assume, without deciding, that the ultra vires doctrine applies to limited liability companies, we note that the withdrawing members do not argue that the Company was without the power to incur these expenses. They only argue that the acts were taken without the allegedly required authority, *i.e.*, permission. The ultra vires doctrine generally does not apply to this situation. See 18B Am. Jur. 2d, Corporations § 2012.

We also observe that the Company is granted a large amount of general power under the Act.

"The KRLLCA replaces prior law's exhaustive list of specific LLC powers with a general statement that an LLC has and may exercise all powers and privileges granted by the KRLLCA, any other law, or its operating agreement, along with any incidental powers, insofar as necessary or convenient for its business, purposes, or activities." Hecker, *The Kansas Revised Limited Liability Company Act,* 69 J.K.B.A. at 17 (citing K.S.A. 1999 Supp. 17-7668[b]).

Moreover, within the context of winding up, the Act provides the Company the specific power to perform a number of the particular acts in dispute in the instant case.

"The persons winding up the LLC have authority to *litigate on its behalf,* gradually settle and close its business, *liquidate its property, pay or make provision for payment of its liabilities,* and distribute its remaining assets to its members, all without affecting the liability of its members or managers and without imposing personal liability on any liquidating trustee." Hecker, *The Kansas Revised Limited Liability Company Act,* 69 J.K.B.A. at 39 (citing K.S.A. 2003 Supp. 17-76,118(b) and K.S.A. 2003 Supp. 76,119[b]). (Emphasis added.)

In short, sections 6.2, 6.3, and 6.4 of the operating agreement fail to provide the withdrawing members any deviation from the general rule of liability.

Although the withdrawing members advise that we need not consider any other sections of the operating agreement, they note that the district court also relied upon sections 6.6 and 6.7 to deny them relief. They suggest in passing, however, those sections could support their position because the managers who incurred the expenses did engage in misconduct and reckless disregard of duty. We disagree, and instead concur with the district court that these sections actually serve as additional grounds for denying the relief requested.

Since the withdrawing members do not contest the binding nature of the Company obligations, the requirements of section 6.7(a) would at first blush appear to provide them some relief. It addresses the scenario where members have bound the Company but by acts outside the scope of their authority. It states that as a general rule, members, including managers,

"shall indemnify and hold the Company and the other Members harmless from and against any loss or damage incurred by it or them as a result of any agreement, contract, instrument, obligation or act *legally binding the Company that was incurred or performed by such Member outside the scope of the authority granted to such Member pursuant to this Agreement.*" (Emphasis added.)

Even assuming the expenses were incurred outside such authority, however, the withdrawing members would be entitled to have the managers pay those members' shares, *i.e.*, indemnify them, only if the managers were guilty of fraud, gross negligence, misconduct or reckless disregard of duty. See section 6.6 (Managers not liable to Company or members for loss suffered by Company or members except where guilty of fraud, gross negligence, misconduct or reckless disregard of duty). The district court held that the withdrawing members made no such claim and, even if so, there was no evidence to prove such a claim.

Our careful review of the record confirms the district court in both respects. First, the closest to a claim on these grounds would have been the withdrawing members' 1996 request for the appointment of a receiver. However, they apparently only argued

managerial "incompetence and intransigence" as their basis. 267 Kan. at 853. Moreover, the record does not reveal any efforts for appointment of a receiver after *Investcorp I*. Second, though the withdrawing members suggest on appeal the existence of proof of misconduct and reckless disregard of duty, the district court found Donald and Reed's actions were reasonable under the facts. Among other things, the court referenced its findings and conclusions contained in its June 30, 2000, journal entry — as quoted earlier in the opinion — which upheld the propriety of the expenses. Substantial competent evidence supports the court's findings.

Additionally, the district court determined that there was no claim and no evidence to prove such a claim, that the "remaining members" (outside of the rogue managers) performed any act outside their scope of authority. After reviewing the extensive record on appeal, particularly the withdrawing members' motion for limited declaratory relief upon which the journal entry they appeal from is based, we agree. As mentioned, while their brief suggests that sections 6.6 and 6.7 "also could apply" because misconduct and reckless disregard of duty allegedly did occur, they make no reference to any conduct except the managers.

Issue 3: *Do fairness and equity require that the withdrawing members not share in paying the Company expenses?*

The withdrawing members also make a number of arguments which can be grouped under the heading of fairness and equity. Essentially, they argue it would be unfair, unjust, and inequitable for them to pay a share of the expenses to which they had objected beginning in 1996. Their argument must be rejected for several reasons.

First, in *Investcorp I* we concluded that the Company — which would include all members — controls dissolution through its manager trustees. We further held that on remand the district court would have "jurisdiction to . . . decide who the managers are to control dissolution." 267 Kan. at 877. See also K.S.A. 2003 Supp. 17-7671(a) (Upon application of any member or manager, the district court may hear and determine the right of any person to be-

come or continue to be a manager of a limited liability company and, in case the right to serve as a manager is claimed by more than one person, may determine the person or persons entitled to serve as managers, and to that end make such order or decree in any such case as may be just and proper). There is nothing in the record on appeal pointed out by the parties, however, to demonstrate that after *Investcorp I* was released the withdrawing members requested the district court to decide "who the managers are to control dissolution." It only reveals that they complained about actions of the existing managers, Donald and Reed.

Second, in *Investcorp I*, we upheld the district court's refusal to appoint a receiver, holding that "the plaintiffs failed to produce a single compelling or constructive reason for the appointment of a receiver." 267 Kan. at 853. We acknowledged the court could later appoint one "if either the requirements of *Browning v. Blair*, 169 Kan. 139, 218 P.2d 233 (1950) (fraud, breach of fiduciary duty, or waste) or a showing of good cause have been met and the interests of all members will best be protected by the appointment of such receiver." 267 Kan. at 877. As mentioned previously in the opinion, however, the record on appeal does not reveal that the withdrawing members ever again attempted to have a receiver appointed. It only reveals that they complained about the actions of the existing managers, Donald and Reed.

Third, the Act clearly and repeatedly recognizes the power of the members to draft an operating agreement to deal with this specific situation. Moreover, since the members are all entities — many of which are sophisticated in business affairs — they not only had the opportunity, but also the ability to effectively use such power. The members simply failed to do so, and we will not rewrite the agreement for the withdrawing members or otherwise save them from their own agreement. See K.S.A. 2003 Supp. 17-76,134(b) (It is the policy of this Act to give the maximum effect to the principle of freedom of contract, and to the enforceability of operating agreements.). *Cf. Froelich v. United Royalty Co.*, 179 Kan. 652, 654, 297 P.2d 1106 (1956) (function of a court is to enforce a contract made by the parties, not to create a contract for

them which is in accord with the court's own notions as to what the contracting parties wisely should have done).

In short, under the unique facts of this case, we hold the withdrawing members are Company members who share in the Company expenses. The parties therefore are controlled by their operating agreement concerning distribution of assets and payment of creditors. Section 9.4 provides that, "[u]pon dissolution and liquidation of the Company, the assets of the Company shall be applied and distributed in the order of priority set forth in Section 4.1 (b)." That section in turn provides:

"4.1(b) Liquidation proceeds shall be distributed in the following order of priority:

"(i) To the payment of debts and liabilities of the Company (including those to the Members) and the expenses of liquidation; then

"(ii) To the Managers in payment of the Manager Additional Contributions (if any) and any return thereon; then

"(iii) The remainder to the Members in accordance with their respective positive Capital Account balances."

Accord K.S.A. 2003 Supp. 17-76,119.

Affirmed.