(234 P.3d 39)
No. 101,647

IRON MOUND, LLC, *Appellant*, v. NUETERRA HEALTHCARE MANAGEMENT, LLC, SUCCESSOR-IN-INTEREST OF ASC GROUP, LLC, *Appellee*.

Opinion filed June 25, 2010.

*Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant.

*Scott C. Nehrbass*, *James D. Oliver*, and *Matthew D. Stromberg*, of Foulston Siefkin LLP, of Overland Park, for appellee.

Before HILL, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: Iron Mound, LLC (Iron Mound) appeals from the trial court's judgment granting summary judgment to Nueterra Healthcare Management, LLC (Nueterra) and denying summary judgment to Iron Mound on Iron Mound's breach of contract claims. On appeal, Iron Mound argues that the trial court inappropriately granted summary judgment to Nueterra based on the trial court's improper interpretation and application of an agreement between the parties as to the payment of management fees. We agree that the trial court improperly granted summary judgment to Nueterra. Based on the evidence presented at the summary judgment stage, a genuine issue of material fact exists as to the parties' intent concerning the payment of management fees under the agreement. As a result, the question of whether Iron Mound was entitled to continued payment of management fees is one of fact, and the issue was prematurely decided as a matter of law at the summary judgment stage. Accordingly, we reverse and remand.

On March 26, 1999, Iron Mound entered into an Operating Agreement with ASC Group, LLC (ASC Group) for ASC Midwest, LLC (ASC Midwest). Under the terms of the Operating Agreement, Iron Mound held a 40% interest in ASC Midwest, and ASC Group held a 60% interest in ASC Midwest. The purpose and business of ASC Midwest was to develop, own, and operate ambulatory surgical facilities and other healthcare facilities.

Before the Operating Agreement was executed, the chairman and president of ASC Group, Dan Tasset, and the equal interest holders in Iron Mound, attorney A.J. Schwartz and Ward Schrae-

der, had been involved in business dealings to develop and manage surgical hospitals, ambulatory surgical centers, and other medical projects. Schwartz testified that before the Operating Agreement was executed, he and Schraeder, not ASC Group, had already made the contacts and done a lot of the "ground floor" work for surgical center projects in Manhattan, Salina, and Topeka and, therefore, Iron Mound was to receive a higher percentage of the management fees from those projects.

The agreement between ASC Group and Iron Mound as to the division of management fees from the surgical centers was outlined in Article X, Section 10.2 of the Operating Agreement as follows:

"**10.2 Revenues Relating to Services Performed by ASC or Its Affiliates.** Following the admission of ASC and Iron Mound as Members of the Company, ASC and Iron Mound agree that ASC or its Affiliates may contract with the Company or the Centers to perform the following specialized services (collectively the 'Services') with the percentage of revenues specified below to be received by the Company and allocated among the Members in accordance with their respective Percentage Interests. It is acknowledged by ASC and Iron Mound that neither the Company nor Iron Mound shall have any right to revenues from the Services which are not included within the percentages set for[th] below. The Company shall be entitled to receive the following percentages of the revenues received by ASC or its affiliates for performing the Services on behalf of the Center:

"(a) Management Services: 25% of the gross management fee received.

"(b) Business Development and Set Up Services: 90% of the development fee received after payment of (i) expenses incurred by ASC and Iron Mount attributable to travel, meals and use of outside consultants to perform such Services, and (ii) payment to Iron Mound of a one time payment of $42,500 for each Center developed by the Company.

"(c) *In the event that ASC or its Affiliates should obtain a Management Agreement for the Topeka, Salina or Manhattan Centers contemplated on the date of the execution of this Agreement, the percentages of the revenues from the Management Services to be received by the Company shall vary from that indicated in (b) above, in that the gross fees received from such Management Agreements shall be divided as follows: (i) Topeka Company 0% and Iron Mound 15%; (ii) Salina and/or Manhattan Company 0% and Iron Mound 20%.*" (Emphasis added.)

On April 24, 1999, ASC Management, LLC (ASC Management), which was a wholly owned subsidiary of ASC Group, and Manhattan Surgical Center, LLC, (Manhattan Surgical Center) entered into a management agreement (Management Agreement I) for

ASC Management "to provide its skills, supervision and certain personnel to operate the Center." As compensation for its services, Manhattan Surgical Center was to pay ASC Management a business development fee of $100,000 and a management fee of 7% of the monthly collected net revenues derived from the operation of Manhattan Surgical Center. Management Agreement I was to remain in effect for 5 years and would automatically renew for successive 5-year terms unless either ASC Management or Manhattan Surgical Center gave notice of election of nonrenewal at least 90 days before the expiration of any such term.

On May 25, 2001, Schwartz sent a letter to Tasset stating that Iron Mound had elected to dissolve ASC Midwest and that he would be attending to the duties regarding the winding up of ASC Midwest. Under Article XV, Section 15.1(b) of the Operating Agreement, Iron Mound could elect to dissolve ASC Midwest: "The Company will be dissolved upon the happening of any of the following events: . . . The election to dissolve by a Member holding at least 40% of the Percentage Interests of the Company." Schwartz filed a Certificate of Cancellation for ASC Midwest with the Kansas Secretary of State's office on May 30, 2001. When ASC Midwest was dissolved, it had no liabilities, and its only significant asset was the interest in management fees with respect to the Manhattan Surgical Center as provided in Section 10.2 of the Operating Agreement. Both Schwartz and Schraeder testified that one of the things accomplished by the dissolution of ASC Midwest was to free Iron Mound from the restrictive covenants under Section 4.7 of the Operating Agreement.

Despite the fact that ASC Midwest was dissolved in May 2001, ASC Management, which later became Nueterra, continued making payments to Iron Mound in compliance with the Operating Agreement until February 2006.

On February 7, 2006, Nueterra entered into a new management agreement (Management Agreement II) with Manhattan Surgical Center for a period of 7 years. Under the terms of Management Agreement II, Manhattan Surgical Center agreed to pay Nueterra 4% of the monthly net revenue for the period during the term beginning February 7, 2006, and ending on January 31, 2007; 3.5%

of the monthly net revenue for the period during the term beginning February 1, 2007 and ending on January 31, 2008; and 3% of the monthly net revenue for the period during the term beginning February 1, 2008, and ending February 6, 2013.

According to Tasset, Manhattan Surgical Center refused to continue paying at the rate specified in Management Agreement I and was going to attempt to find a new management company or to manage itself. As a result, Nueterra negotiated Management Agreement II with substantially lower management fees. Tasset outlined the differences between the two management agreements, including that Nueterra provided all the business office billing functions under Management Agreement I and now Manhattan Surgical Center provided those services under Management Agreement II. On the other hand, James McAtee, M.D., who apparently was on the Board of Managers for Manhattan Surgical Center, testified that Nueterra's responsibilities before and after the execution of Management Agreement II were not significantly different.

Schwartz testified that during August 2005 in the presence of David Ayres, the chief executive officer of Nueterra, Schwartz told the Board of Manhattan Surgical Center that Iron Mound was involved in sharing expected fees from Management Agreement II. Schwartz stated that Ayres did not disagree or contradict this assertion. Moreover, according to Schwartz, Ayres had previously made the statement that sharing fees with Iron Mound was just the cost of doing business.

Schraeder sat on the Board of Managers of Manhattan Surgical Center, and he recused himself from the discussions concerning Management Agreement II. McAtee testified that during the process of discussing Management Agreement II, Schraeder had mentioned a potential conflict of interest because of Iron Mound receiving payments under the contract. According to McAtee, there were meetings where Schraeder recused himself from voting because of a potential conflict of interest. McAtee testified that Scott Christ, Nueterra's vice president, most likely would have been there during the discussions about Schraeder's conflict of interest.

After Management Agreement II was signed, Ayres told Christ that there would be no future payments to Iron Mound. When Iron Mound stopped receiving its portion of Nueterra's gross management fees, Schwartz contacted Nueterra about the nonpayment. Nueterra's attorney responded that the management agreement contemplated under the Operating Agreement had expired and that Nueterra had entered into an entirely new agreement with Manhattan Surgical Center.

In October 2006, Iron Mound sued Nueterra for breach of contract based on Nueterra's failure to pay Iron Mound a percentage of the gross management fees under Section 10.2(c) of the Operating Agreement.

In June 2007, before discovery was complete, Nueterra moved for summary judgment against Iron Mound. Nueterra argued that it was entitled to summary judgment because the undisputed facts showed (1) that the old management agreement, which was contemplated when the operating agreement was executed, had expired; and (2) that the new management agreement was separate and distinct from the old agreement. Nueterra moved to stay discovery until the trial court ruled on its motion for summary judgment. After hearing arguments from both parties, the trial court determined that discovery should proceed and that Nueterra's motion for summary judgment would be taken up for later disposition once the parties agreed that it was ripe or when discovery was completed.

In August 2008, Nueterra again moved for summary judgment against Iron Mound. Nueterra argued that it was entitled to summary judgment because the Operating Agreement did not contain a survival clause and because no right to share in the gross management fees paid under Management Agreement II had accrued or vested before dissolution of ASC Midwest.

Also in August 2008, Iron Mound moved for summary judgment against Nueterra. Iron Mound argued that it was entitled to summary judgment because Nueterra had breached its agreement under the Operating Agreement to pay Iron Mound 20% of the gross management fees earned while providing management services for Manhattan Surgical Center.

In a November 2008 written order, the trial court determined that Iron Mound had no contractual right to share in Nueterra's management fees under Management Agreement II. The trial court noted that the parties had failed to reserve any rights upon termination of ASC Midwest's operating agreement. The trial court determined that although Iron Mound "may have been vested as to the fee-sharing under the Management Agreement signed in 1999," those rights terminated when Management Agreement I expired in 2006. The trial court further determined that when Management Agreement II was executed, ASC Midwest and its operating agreement no longer existed. As a result, the trial court granted Nueterra's motion for summary judgment and denied Iron Mound's motion for summary judgment.

On appeal, Iron Mound argues that the trial court erred in denying its motion for summary judgment and in granting Nueterra's motion for summary judgment.

*Standard of Review*

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

*Rules of Contract Interpretation*

The parties' arguments on this issue require interpretation of various provisions of the Operating Agreement. The primary rule for interpreting written contracts is to ascertain the intent of the

parties. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. *Anderson v. Dillard's Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007).

Further, the interpretation of a contractual provision should not be reached merely by isolating a particular sentence or provision, but by construing and considering the entire contract from its four corners. *City of Arkansas City v. Bruton*, 284 Kan. 815, 832-33, 166 P.3d 992 (2007). " 'The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]' " *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946 (2008).

*Interpretation of Section 10.2 of Operating Agreement*

In its appellate brief, Nueterra renews its argument from its first summary judgment motion that Iron Mound is not entitled to receive any gross management fees from Management Agreement II because Management Agreement II was not contemplated when the Operating Agreement was executed.

On the other hand, Iron Mound argues that the word "contemplated" under Section 10.2 of the Operating Agreement refers to a "Management Agreement for the Topeka, Salina and Manhattan Centers," not just to the term "Management Agreement." Therefore, under Iron Mound's interpretation of Section 10.2, Iron Mound had a right to receive a portion of the management fees as long as Nueterra had a management contract with Manhattan Surgical Center.

The applicable portion of Section 10.2(c) of the Operating Agreement provides as follows:

"In the event that ASC or its Affiliates should obtain a Management Agreement for the Topeka, Salina or Manhattan Centers contemplated on the date of the execution of this Agreement, the percentages of the revenues from the Management Services to be received by the Company shall vary from that indicated in (b) above, in that the gross fees received from such Management Agreements shall be divided as follows: (i) Topeka Company 0% and Iron Mound 15%; (ii) Salina and/or Manhattan Company 0% and Iron Mound 20%." (Emphasis added.)

There is support for Iron Mound's interpretation that the word "contemplated" under Section 10.2 of the Operating Agreement

refers to a "Management Agreement for the Topeka, Saline and Manhattan Centers." For example, the placement of the adjective phrase "for the Topeka, Salina or Manhattan Centers" after the noun "Management Agreement" indicates that the parties intended for Iron Mound to receive a portion of the gross management fees for the Manhattan Surgical Center. If the parties had intended the verb "contemplated" to assert something about only the noun "Management Agreement," they could have written the sentence to read as follows: "In the event that ASC or its affiliates should obtain a Management Agreement contemplated on the date of the execution of this Agreement . . . ." Nevertheless, it would have been necessary to omit the adjective phrase "for the Topeka, Salina or Manhattan Centers" from the dependent clause.

For example, if the dependent clause was rewritten so that the words in the adjective phrase were placed in front of the noun "Management Agreement," the meaning would be the same: "In the event that ASC or its affiliates should obtain a *Topeka, Salina, or Manhattan Center Management Agreement* contemplated on the date of the execution of this Agreement . . . ." Even with this reorganization of the wording in the dependent clause, it would seem that the interpretation of the language would be that the parties had intended for Iron Mound to receive a portion of the gross management fees for the Manhattan Surgical Center. That is because the adjective phrase "for the Topeka, Salina, or Manhattan Center" is a limiting adjective phrase that tells which one or how many of the management centers are contemplated.

While Iron Mound's interpretation seems to be the logical interpretation based on the plain language of Section 10.2 of the Operating Agreement, Nueterra points out that this interpretation would allow Iron Mound to receive gross management fees in perpetuity as long as Nueterra had a management agreement with Manhattan Surgical Center. Nueterra further points out that in *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 476, 608 P.2d 890 (1980), our Supreme Court referred to "a traditional distaste for contractual rights and duties between parties unbounded by definite limitations of time."

On the other hand,

"[t]he law presumes that the parties understood their contract and that they had the intention which its terms import. [Citation omitted.] It is not the function of courts to make contracts, but to enforce them as made, [citation omitted], nor is it within the province of the court to reform an instrument by rejecting words of clear and definite meaning and substituting others therefor. [Citations omitted.]" *Tri-State Hotel Co., Inc. v. Sphinx Inv. Co., Inc.*, 212 Kan. 234, 246, 510 P.2d 1223 (1973).

Nueterra further points out, however, that Iron Mound had originally asserted a theory of recovery that presupposed the word "contemplated" asserted something about only the noun "Management Agreement." In other words, the word "contemplated" did not relate to the adjective phrase "for the Topeka, Salina and Manhattan Centers," which identifies the particular management agreement centers contemplated. Specifically, Iron Mound originally alleged that Management Agreement I was contemplated by the Operating Agreement and that Management Agreement II was a continuation of Management Agreement I.

The contract in this case is ambiguous. The lack of a time limitation on the payment of the gross management fees under Section 10.2 of the Operating Agreement could indicate that the parties intended for Iron Mound to receive a portion of the fees for a management agreement contemplated on the date of the execution of the Operating Agreement. It could also indicate, however, that Nueterra considered Iron Mound's contacts and ground level work on the Manhattan Surgical Center to be so valuable that it agreed to pay Iron Mound a portion of its gross management fees as long as it had a management contract with Manhattan Surgical Center.

For example, under Section 10.2(c) of the Operating Agreement, Iron Mound was to receive 20% of the gross management fees received by Nueterra from the Manhattan Surgical Center while ASC Midwest was to receive no percentage of the gross management fees from that Center. In fact, with the exception of the Topeka and Salina Centers, Iron Mound was to receive only 10% of the 25% gross management fees received under Section 10.2(a) of the Operating Agreement from the development of any other surgical centers. Moreover, ASC Midwest would receive the lion's share (90%) of those fees. Section 10.2(b). Obviously, Iron Mound

had done something to justify receiving a higher percentage of the gross management fees for the Manhattan Center than it was going to receive for its efforts in developing any other surgical centers, with the exception of the Topeka and Salina Centers.

*Termination of Operating Agreement*

Nevertheless, Nueterra contends that the trial court correctly determined that the dissolution of ASC Midwest terminated the Operating Agreement. Before the trial court, Nueterra argued that with Iron Mound's election to dissolve ASC Midwest, Nueterra was no longer required "to pay the company a percentage of management fees for distribution to Iron Mound."

Nueterra points out that Iron Mound elected to dissolve ASC Midwest under Section 15.1(b) of the Operating Agreement and filed a Certificate of Cancellation with the Kansas Secretary of State's office. Schwartz sent a letter to Nueterra about Iron Mound's election to dissolve the company and stated that he was winding up the affairs of ASC Midwest.

Although Nueterra maintains that Iron Mound's dissolution of ASC Midwest effectively terminated the Operating Agreement, it has not provided this court with any case or statutory law that stands for this specific proposition.

While Kansas statutes outline the procedure for creating and dissolving a limited liability company, they do not provide for the termination of all the provisions of an operating agreement upon dissolution. Specifically, K.S.A. 17-7673 provides for the creation of a limited liability company as follows:

"(a) In order to form a limited liability company, articles of organization shall be filed with the secretary of state . . .

. . . .

"(b) A limited liability company is formed at the time of the filing of the initial articles of organization with the secretary of state or at any later date or time specified in the articles of organization which is not later than 90 days after the date of filing, if, in either case, there has been substantial compliance with the requirements of this section. A limited liability company formed under this act shall be a separate legal entity, the existence of which as a separate legal entity shall continue until cancellation of the limited liability company's articles of organization.

"(c) An operating agreement may be entered into either before, after or at the time of the filing of the articles of organization and, whether entered into before, after or at the time of such filing, may be made effective as of the formation of the limited liability company or at such other time or date as provided in the operating agreement."

K.S.A. 17-7675 then provides for cancellation of a limited liability company's articles of organization upon dissolution as follows:

"Articles of organization shall be canceled upon the dissolution and the completion of winding up of a limited liability company, or as provided in subsection (d) of K.S.A. 17-7666, and amendments thereto, or K.S.A. 17-76,139, and amendments thereto, or upon the filing of a certificate of merger or consolidation if the limited liability company is not the surviving or resulting entity in a merger or consolidation, or upon the conversion of a domestic limited liability company approved in accordance with K.S.A. 17-7685, and amendments thereto, by filing a certificate of cancellation with the secretary of state to accomplish the cancellation of articles of organization upon the dissolution and the completion of winding up of a limited liability company . . . ."

Although K.S.A. 17-7673 specifically provides for the creation of an operating agreement for an LLC, there is no corresponding automatic termination provision in K.S.A. 17-7675. Because an operating agreement constitutes a contract between the parties, it is necessary to look at the plain language of the agreement to ascertain the parties' intent as to whether certain provisions survive the dissolution of an LLC.

Here, the Operating Agreement is silent as to whether Section 10.2(c), the provision relating to the payment of the gross management fees, survived dissolution of ASC Midwest. Nueterra argues that because there is no express survival language relating to Section 10.2(c), that provision terminated, along with the rest of the Operating Agreement, with the dissolution of ASC Midwest. If this court were to accept Nueterra's argument, all of the provisions in the Operating Agreement would automatically terminate upon ASC Midwest's dissolution and there would be no need to include express termination language. Nevertheless, the Operating Agreement specifically terminated certain obligations under the agreement upon ASC Midwest's dissolution. Specifically, Section 4.7(d), which relates to the restrictive covenants under the agreement, states that "[t]he provisions of this Section 4.7 shall be null,

void and unenforceable by the Company of any Member upon the occurrence of a dissolution event as contemplated under Section 15.1 below." Because no such language exists in relation to the payment of the gross management fees under Section 10.2(c), there is at least an ambiguity as to whether the parties intended for their agreement as to the payment of management fees to survive dissolution.

Although Nueterra points out that Iron Mound's own representatives, Schraeder and Schwartz, testified that they thought the Operating Agreement was terminated when ASC Midwest was dissolved, this assertion is not an accurate representation of Schwartz' other testimony in the case and the parties' actions in regard to the payment of the gross management fees. Schwartz testified in his deposition that under the parties' agreement, Nueterra had a continuing obligation to pay Iron Mound 20% of the gross management fees received for management services provided to Manhattan Surgical Center. Moreover, Iron Mound presented additional evidence that Schraeder had recused himself from discussions about Management Agreement II because of Iron Mound's right to receive payment under the contract. Further, Nueterra's actions in continuing to pay the gross management fees evidence that the parties intended for their agreement under Section 10.2 of the Operating Agreement to survive the dissolution of ASC Midwest.

In arguing that the entire Operating Agreement automatically terminated upon the dissolution of ASC Midwest, Nueterra cites a general contract principle outlined in *Saylor v. Brooks*, 114 Kan. 493, 496, 220 Pac. 193 (1923). In *Saylor*, our Supreme Court applied the principle that performance under a contract is excused when the subject matter of the contract has ceased to exist through no fault of the parties to a landlord's obligation under a lease agreement:

"We do not think the fact that a lease covering a part of a building contains the statement that the landlord agrees to keep it in repair has any fair tendency to indicate that the parties actually contemplated an obligation on his part to rebuild in case the whole house should be destroyed, and we see no sufficient grounds to interpret the language as imposing that duty upon him. The situation impresses us as one for the application of the principle under which the performance of a

contract is excused, where, through no fault of the parties, its subject-matter, without which it cannot be executed, has ceased to exist." 114 Kan. at 496.

Thus, our Supreme Court held that the agreement to repair in the lease did not obligate the landlord to restore the building in case of its destruction by fire when the destruction was caused through no fault of the landlord. 114 Kan. at 496.

In attempting to apply the principle outlined in *Saylor* to this case, Nueterra contends that because the subject matter of the Operating Agreement (ASC Midwest) was gone, so too was the Operating Agreement and all its promises thereunder. *Saylor*, however, does not so easily lend itself to such an interpretation. First, an argument could be made that the subject matter of Section 10.2 of the Operating Agreement was Nueterra's (formerly ASC Management's) management agreement for the Manhattan Surgical Center and that it had not been destroyed.

More important, what separates this case from *Saylor* is that there is evidence here to show that the parties, by their conduct and course of dealing, did not intend for the payment agreement under the Operating Agreement to terminate with the dissolution of ASC Midwest.

### *Parties' Conduct and Continued Course of Dealing*

The parties' conduct and continued course of dealing in relation to the payment of management fees under the Operating Agreement is highly relevant in ascertaining the existence and terms of the parties' agreement. Under Kansas law, "a court may ascertain the existence and terms of an agreement from a combination of written instruments and the acts of the parties in connection therewith. [Citation omitted.]" *Reznik v. McKee, Trustee*, 216 Kan. 659, 673, 534 P.2d 243 (1975); see also *Allen v. Bowling*, 173 Kan. 485, 490, 249 P.2d 679 (1952) ("It is just as well established that an agreement and its terms may be ascertained by a combination of written communications and the acts of the parties.").

Under Restatement (Second) of Contracts § 202 (1981), a party's repeated course of performance is given great weight when interpreting an agreement:

"(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

"(5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."

Kansas has long emphasized the significance of the practical interpretation the parties have given a contract through their course of dealing. See *Heckard v. Park*, 164 Kan. 216, 188 P.2d 926 (1948) ("In case of actual ambiguity the operative construction by the parties is of controlling significance."); *Kirkpatrick v. Chrysler Sales Corp.*, 127 Kan. 724, 275 Pac. 155 (1929) (operative construction of contract given controlling significance [Citations omitted.]").

More recent, our Supreme Court has stated that where ambiguity is involved in an agreement, courts consider "all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties. [Citation omitted.]" *Universal Motor Fuels, Inc. v. Johnston*, 260 Kan. 58, 63, 917 P.2d 877 (1996). Our Supreme Court has further held that "[t]he parties to a contract know best what was meant by its terms, since they are the least liable to be mistaken as to what was intended, and where the contract is ambiguous as to a material point, parol evidence will be received to aid in its construction. [Citation omitted.]" *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, Syl. ¶ 7, 508 P.2d 889 (1973).

The parties' conduct and course of dealing in this case indicates that the parties intended for the payment of the gross management fees as set forth in Section 10.2(c) of the Operating Agreement to continue after the dissolution of ASC Midwest. Despite the fact that Iron Mound exercised its right to dissolve ASC Midwest and filed a Certificate of Cancellation with the Kansas Secretary of State's office in May 2001, Nueterra continued to fulfill the payment obligation under the Operating Agreement for nearly 5 more years by paying Iron Mound its portion of the gross management

fees. If there was no intention of the parties to continue the Operating Agreement once ASC Midwest was dissolved, why did Nueterra continue its payment obligation to Iron Mound? Moreover, Iron Mound points out that Nueterra's course of conduct in continuing to make management fees payments to Iron Mound according to the Operating Agreement is inconsistent with Nueterra's claim that the entire Operating Agreement automatically terminated upon the dissolution of ASC Midwest.

*Nueterra's Explanation of Continued Payments to Iron Mound*

Upon being questioned at oral argument as to why Nueterra continued making management fee payments to Iron Mound, Nueterra's counsel explained that the payment of management fees under Management Agreement I had vested under the Operating Agreement and that Nueterra was still obligated to make the payments as long as Management Agreement I was in existence.

Nevertheless, Nueterra shifted its position at oral argument from the position it took before the trial court. Specifically, in responding to Iron Mound's argument in its motion for summary judgment, Nueterra asserted that Iron Mound did not have a vested share right in the gross management fees:

"Iron Mound asserts that, even if the Operating Agreement terminated, Section 10.2(c) somehow survived because Iron Mound had a 'vested right' to a share of the Manhattan Surgical management fees. That is simply not the case. *As the Operating Agreement itself makes clear, any right Iron Mound had to share in management fees flowed to it as a member of ASC Midwest, the 'Company' referenced in the Operating Agreement a 'Company' that no longer exists.*" (Emphasis added.)

Further, pointing out that it was no longer bound by the management fees agreement once ASC Midwest was dissolved, Nueterra stated: *"Once the company ceased to exist and Iron Mound ceased being a member, it was no longer bound by the restrictive covenant just as [Nueterra] was no longer required to pay the company a percentage of the management fees for distribution to Iron Mound."* (Emphasis added.)

Nueterra's assertions before this court and the trial court are confusing and seemingly irreconcilable. On the one hand, Nueterra

would like for the court to hold that the Operating Agreement terminated upon ASC Midwest's dissolution and that it had no further obligation under the provisions of the Operating Agreement. This, however, does not explain why Nueterra continued making payments to Iron Mound for nearly 5 years after ASC Midwest's dissolution. Thus, Nueterra has been forced to move to the other hand and urge this court to hold that there was still an obligation under the Operating Agreement for it to continue making payments to Iron Mound. Nevertheless, Nueterra cannot have it both ways. Either Nueterra's obligations to pay management fees terminated with the dissolution of ASC Midwest or they continued after the dissolution.

At the very least, an issue of fact exists as to the effect of the continued payments to Iron Mound at the dissolution of ASC Midwest, and the trial court's grant of summary judgment in favor of Nueterra was premature. See *Mobile Acres*, 211 Kan. 833, Syl. ¶ 9 ("Where there is ambiguity in a written contract and extrinsic or parol evidence is required to ascertain the parties' intentions, summary judgment should not be entered in the face of contradictory or conflicting evidence.").

Because the evidence presented at the summary judgment stage is conflicting on the issue of the parties' intent concerning the payment of the gross management fees to Iron Mound for the Manhattan Surgical Center and permits more than one inference, the question of whether Iron Mound was entitled to any gross management fees under Management Agreement II is one of fact and should not have been decided as a matter of law at the summary judgment stage.

Based on the previous analysis, we reverse the trial court's entry of summary judgment in favor of Nueterra, reject Iron Mound's argument that summary judgment should have been granted in its favor, and remand the case to the trial court for further proceedings.

Reversed and remanded.