No. 101,647

IRON MOUND, LLC, *Appellant*, v. NUETERRA HEALTHCARE MANAGEMENT, LLC, Successor-in-Interest of ASC GROUP, LLC, *Appellee*.

(313 P.3d 808)

Opinion filed December 6, 2013.

*Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and was on the briefs for appellant.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Scott C. Nehrbass* and *Matthew D. Stromberg*, of the same firm, were with him on the briefs for appellee.

The opinion of the court was delivered by

MORITZ, J.: We granted Nueterra Healthcare Management, LLC's (Nueterra) petition for review of the Court of Appeals' de-

cision reversing the district court's grant of summary judgment in Nueterra's favor in this contract action brought by Iron Mound, LLC (Iron Mound). Iron Mound alleged that under the Operating Agreement of ASC Midwest, LLC, a limited liability company formed by Nueterra and Iron Mound and later dissolved, Iron Mound was entitled to receive a percentage of the gross fees earned by Nueterra under a management agreement entered into after the Operating Agreement had expired. Because we conclude the unambiguous terms of the Operating Agreement render it inapplicable to the fees received by Nueterra under the management agreement in question, we reverse the Court of Appeals' decision reversing the district court, and we affirm the district court's grant of summary judgment in favor of Nueterra.

### FACTUAL AND PROCEDURAL BACKGROUND

Iron Mound and ASC Group, LLC entered into an Operating Agreement on March 26, 1999, for the formation and governance of ASC Midwest, LLC (the Company). The parties created the Company "to develop, own, and operate ambulatory surgical facilities and other healthcare facilities." Nueterra is the successor-in-interest to the ASC Group, LLC. The Company's initial members, Iron Mound and Nueterra, remained its only members until its dissolution.

The Operating Agreement contained specific language regarding the division of fees for services performed by Nueterra. The applicable language provides, in relevant part:

"10.2 **Revenues Relating to Services Performed by [Nueterra] or Its Affiliates.** Following the admission of [Nueterra] and Iron Mound as Members of the Company, [Nueterra] and Iron Mound agree that [Nueterra] or its Affiliates may contract with the Company or the Centers to perform the following specialized services (collectively the 'Services') with the percentage of revenues specified below to be received by the Company and allocated among the Members in accordance with their respective Percentage Interests. It is acknowledged by [Nueterra] and Iron Mound that neither the Company nor Iron Mound shall have any right to revenues from the Services which are not included within the percentages set for[th] below. The Company shall be entitled to receive the following percentages of the revenues received by [Nueterra] or its affiliates for performing the Services on behalf of the Center:

(a) Management Services: 25% of the gross management fee received.

. . . .

(c) In the event that [Nueterra] or its Affiliates should obtain a Management Agreement for the Topeka, Salina or Manhattan Centers contemplated on the date of the execution of this Agreement, the percentages of the revenues from the Management Services to be received by the Company shall vary from that indicated in (b) [*sic*, should be (a)] above, in that the gross fees received from such Management Agreements shall be divided as follows: (i) Topeka—Company 0% and Iron Mound 15%; (ii) Salina and/or Manhattan —Company 0% and Iron Mound 20%."

Less than 1 month after the Company's creation, Nueterra entered into a management agreement (Management Agreement I) with Manhattan Surgical Center, LLC (Manhattan Surgical Center). Pursuant to its terms, Management Agreement I would remain in effect for 5 years and would automatically renew for successive 5-year terms unless either Nueterra or Manhattan Surgical Center elected not to renew and gave timely notice to the other party.

Approximately 2 years after the creation of the Company, Iron Mound exercised its right to dissolve the Company under Section 15.1(b) of the Operating Agreement. A.J. Schwartz, a Wichita attorney and one-half owner of Iron Mound, filed the certificate of cancellation for the Company on May 30, 2001, and attended to the other duties of winding up the Company. At the time of its dissolution, the Company had no liabilities, and, according to both parties, its "only significant company asset was the interest in management fees generated from the Manhattan Surgical Center."

Section 15.2 of the Operating Agreement provided for liquidation of the Company's assets upon dissolution, in relevant part, as follows:

"15.2 **Liquidation.** Upon the happening of any of the events specified in Section 15.1, the Board of Managers will commence as promptly as practicable to wind up the Company's affairs. Assets of the Company may be liquidated or distributed in kind. The Members will continue to share Cash Flow, Profits and Losses during the period of liquidation in the manner set forth in Articles X and XI. The proceeds from liquidation of the Company, including repayment of any debts of Members to the Company, and any Company assets that are not sold in connection with the liquidation will be applied in the following order . . . ."

Following dissolution of the Company, Nueterra continued paying Iron Mound a percentage of gross fees generated under Man-

agement Agreement I according to the terms of Section 10.2(c) of the Operating Agreement until February 2006. At that time, Manhattan Surgical Center exercised its right not to renew Management Agreement I, but it invited Nueterra to negotiate an agreement with different terms. On February 7, 2006, Nueterra and Manhattan Surgical Center entered a second, renegotiated management agreement (Management Agreement II).

After Management Agreement I expired, Nueterra discontinued its payments to Iron Mound of a percentage of the gross fees received under Management Agreement I. When Schwartz inquired about the nonpayment, Nueterra's attorney responded that Management Agreement I—which was contemplated by the Company's Operating Agreement—had expired and Nueterra had entered into an entirely new agreement with Manhattan Surgical Center, Management Agreement II—which was not subject to the fee splitting provisions of the Operating Agreement.

In October 2006, Iron Mound sued Nueterra for breach of contract based on Nueterra's refusal to pay Iron Mound a percentage of the gross management fees Nueterra received under Management Agreement II. Iron Mound claimed it was entitled to a percentage of those fees as provided in Section 10.2(c) of the Operating Agreement.

Ultimately, Nueterra filed two motions for summary judgment. In its first motion, Nueterra argued Management Agreement I was the only management agreement contemplated by the parties under the Operating Agreement, Section 10.2(c). Nueterra reasoned that after Management Agreement I expired, Nueterra had no further obligation to pay Iron Mound a percentage of the management fees Nueterra received under Management Agreement II, which Nueterra characterized as a separate and distinct agreement from Management Agreement I. The district court deferred ruling on this motion until discovery was complete.

Following discovery, Nueterra filed a second motion for summary judgment, reiterating its argument from the first motion and further contending:

"It is axiomatic that when a contract terminates, the only rights that remain in force are those rights which are expressly extended beyond termination or those

which have already accrued or vested. The Operating Agreement of [the Company] . . . was terminated upon dissolution of [the Company] on May 30, 2001. No rights in the Operating Agreement were expressly extended beyond termination of the contract."

In a cross-motion for summary judgment, Iron Mound argued the Company's dissolution did not terminate the Operating Agreement; rather, pursuant to Section 15.2, duties continued to flow between the members even after the Company's dissolution. Iron Mound further argued the word "contemplated" in Section 10.2(c) referred to any agreement with Manhattan Surgical Center, not to a specific management agreement. Iron Mound contended that the Operating Agreement, even after its termination, required Nueterra to pay Iron Mound 20% of the gross fees earned as long as Nueterra received management fees from Manhattan Surgical Center. Both parties characterized the Operating Agreement as clear and unambiguous.

The district court granted Nueterra's second motion for summary judgment, denied Iron Mound's cross-motion, and dismissed the action. The district court determined that while the parties to the Operating Agreement could have reserved or extended rights beyond termination of the Operating Agreement, their intent to do so must have been explicitly stated. But the court found the Operating Agreement silent regarding future management agreements or the survival of rights upon termination or expiration of the Operating Agreement. The district court concluded:

"Here, no intent is stated, therefore it follows that no rights survive termination. The new Management Agreement signed February 7, 2006, was not a renewal of the Management Agreement dated April 24, 1999. When [the Company] dissolved, the Operating Agreement terminated. The fee-sharing provision contained no survival clause, and the Operating Agreement included no general survival clause."

Iron Mound appealed the grant of Nueterra's motion for summary judgment and the denial of its cross-motion to the Court of Appeals.

Based on its conclusion that there were at least two reasonable interpretations as to what management agreement was "contemplated" under Section 10.2(c), the Court of Appeals panel found

the Operating Agreement to be ambiguous. *Iron Mound v. Nueterra Healthcare Management*, 44 Kan. App. 2d 104, 111-13, 234 P.3d 39 (2010). Consequently, the panel turned to the parties' conduct to resolve the ambiguity. Focusing on Nueterra's continuation of management fee payments to Iron Mound after the Company's dissolution, the panel found conflicting evidence regarding the par-.ties' intent in continuing those payments. Thus, the panel decided unresolved issues of fact remained regarding Iron Mound's entitlement to a percentage of fees under Management Agreement II and reversed the district court's summary judgment in favor of Iron Mound. 44 Kan. App. 2d at 119-20.

We granted Nueterra's petition for review under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

ANALYSIS

In seeking review, Nueterra argued the panel's decision conflicts with principles of contract interpretation and termination of contractual obligations and the panel erred in relying on posttermination conduct to alter an unambiguous contract.

When examining the propriety of summary judgment, we apply the same rules as the district court:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]' " *Scott v. Hughes*, 294 Kan. 403, 411, 275 P.3d 890 (2012) (quoting *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 [2009]).

We apply contract law principles to interpret the operating agreement of a limited liability company. See *Investcorp, L.P. v. Simpson Investment Co., L.C.*, 267 Kan. 840, 848, 983 P.2d 265

(1999); see also *Osterhaus v. Toth,* 291 Kan. 759, 768, 249 P.3d 888 (2011) (appellate court exercises de novo review over interpretation and legal effect of written contracts). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." 291 Kan. at 768.

When possible, a court ascertains the parties' intent from the four corners of the operating agreement, construing " 'all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision.' " *Investcorp,* 267 Kan. at 848 (quoting *Metropolitan Life Ins. Co. v. Strnad,* 255 Kan. 657, 671, 876 P.2d 1362 [1994]). When the language of the contract is clear, there is no room for construction or modification of the terms. *Metropolitan Life Ins. Co.,* 255 Kan. at 671. A contract is not ambiguous unless two or more meanings can be construed from the contract provisions. *Carrothers Constr. Co. v. City of South Hutchinson,* 288 Kan. 743, 751, 207 P.3d 231 (2009). If the court finds ambiguity, then it may consider additional information in order to clarify the parties' intent, including the parties' subsequent conduct. See *Central Natural Resources v. Davis Operating Co.,* 288 Kan. 234, 245, 201 P.3d 680 (2009).

*Discussion*

The issue before us is whether Iron Mound had a right under the Operating Agreement to receive a percentage of the management fees paid to Nueterra under Management Agreement II. In answering that question, we first consider whether the intent of the parties is clear from the language of the Operating Agreement, as both parties contend, or whether it is ambiguous, as the panel found, requiring application of the rules of construction.

In finding the contract ambiguous as to whether Nueterra was required to continue paying management fees to Iron Mound under Management Agreement II, the panel focused almost exclusively on Section 10.2(c) of the Operating Agreement and its provision for division of fees from "contemplated" management agreements. The panel reasoned that because that section con-

tained no time limitation for the payment of management fees, it could reasonably be interpreted to mean either the parties intended (1) that Iron Mound receive a portion of the gross management fees *only* for the management agreement that was contemplated on the date of execution of the Operating Agreement, *i.e.,* Management Agreement I, or (2) that Nueterra considered Iron Mound's contacts and ground level work in developing the agreement with Manhattan Surgical Center to be so valuable that it agreed to pay Iron Mound a portion of the gross management fees as long as Nueterra had a management agreement with Manhattan Surgical Center. *Iron Mound,* 44 Kan. App. 2d at 113.

The panel rejected Nueterra's contention that dissolution of the Company also terminated the Operating Agreement and found the Operating Agreement silent as to whether the parties intended Section 10.2(c), regarding the payment of gross management fees, to survive the dissolution of the Company. 44 Kan. App. 2d at 117-18. Because of this perceived ambiguity, the panel considered the conduct of the parties and found conflicting evidence as to whether Iron Mound should receive a portion of the gross management fees under Management Agreement II. The Court of Appeals reversed and remanded based upon this conflicting evidence. 44 Kan. App. 2d at 120.

But in finding an ambiguity, the panel failed to consider other provisions of the Operating Agreement and their effect on the meaning of Section 10.2(c). In particular, the panel failed to consider any of the introductory language of Section 10.2, which gives effect to all of that section and of which subsection (c) is merely one subpart:

"10.2 **Revenues Relating to Services Performed by [Nueterra] or Its Affiliates.** Following the admission of [Nueterra] and Iron Mound as Members of the Company, [Nueterra] and Iron Mound agree that [Nueterra] or its Affiliates may contract with the Company or the Centers to perform the following specialized services (collectively the 'Services') *with the percentage of revenues specified below to be received by the Company and allocated among the Members* in accordance with their respective Percentage Interests. It is acknowledged by [Nueterra] and Iron Mound that neither the Company nor Iron Mound shall have any right to revenues from the Services which are not included within the percentages set for[th] below. *The Company shall be entitled to receive* the following per-

centages of the revenues received by [Nueterra] or its affiliates for performing the Services on behalf of the Center:

    (a) Management Services: 25% of the gross management fee received.

   . . . .

    (c) In the event that [Nueterra] or its Affiliates should obtain a Management Agreement for the Topeka, Salina or Manhattan Centers contemplated on the date of the execution of this Agreement, the percentages of the revenues from the Management Services *to be received by the Company* shall vary from that indicated in (b) [*sic*, should be (a)] above, in that the gross fees received from such Management Agreements shall be divided as follows: (i) Topeka—Company 0% and Iron Mound 15%; (ii) Salina and/or Manhattan—Company 0% and Iron Mound 20%." (Emphasis added.)

The initial paragraph of Section 10.2 evidences a clear intent that Iron Mound's right to a percentage of the revenues specified in the subsections (a), (b), and (c), including a portion of the fees from management services, was conditioned upon or derived from its membership in the Company and the terms of the Operating Agreement. Significantly, it is undisputed that when Nueterra entered into Management Agreement II with Manhattan Surgical Center on February 7, 2006, the Operating Agreement had ceased to exist by its very terms on February 6, 2006, and thus there was no "Company" to "receive" revenues and no "Members" to whom such revenues would be allocated. It is further undisputed that Management Agreement II was a new and separate contract—not a renewal of Management Agreement I, which had expired.

Thus, while the parties concede that the right to gross management fees received from the Manhattan Surgical Center under Management Agreement I was an "asset" of the Company subject to liquidation or distribution in kind under Section 15.2, that concession has no relevance to Management Agreement II, which could never have been an "asset" of a company that had ceased to exist at the time the contract was executed. To find otherwise would require both a strained reading of the Operating Agreement and consideration of matters extrinsic to the contract. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003) (court will not strain to find ambiguity where in common sense, there is none); *Investcorp*, 267 Kan. at 848; see also *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, 206, 235 P.3d 515 (2010) (if

contract, read as a whole, is unambiguous, court will not consider conduct of parties). For this reason, we conclude the unambiguous terms of the Operating Agreement render it inapplicable to the fees received by Nueterra under Management Agreement II.

Although stated somewhat differently, our conclusion today essentially mirrors that of the district court, which noted that the parties to a contract may provide that certain rights and liabilities survive termination of the contract, as long as that intent is explicitly stated. Citing *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 207-08, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991), the district court then succinctly held:

"Plaintiff may have been vested as to the fee-sharing under the Management Agreement signed in 1999, but those rights terminated when it expired, by its terms, in 2006. When the new Management Agreement was executed, [the Company] and the Operating Agreement in question did not exist."

Thus, the district court recognized, as we have today, that even if Management Agreement I was an "asset" of the Company subject to continuing payment through dissolution, Management Agreement II could not have been an asset of the Company subject to dissolution as the Operating Agreement had ceased to exist when that agreement was executed.

Finally, we note that based on our conclusion today, it is unnecessary to consider the broader question posed to us regarding whether, absent express language to the contrary, the dissolution of a limited liability company also terminates its operating agreement.

The Court of Appeals' decision reversing the district court is reversed, and the district court's decision granting summary judgment in favor of Nueterra and denying summary judgment to Iron Mound is affirmed.