NOT DESIGNATED FOR PUBLICATION

No. 128,392

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KY W. HORNBAKER,
as Trustee of the Ky W. Hornbaker Trust Agreement, and
Derivatively on Behalf of Wilderness Holdings, LLC,
*Appellee*,

v.

THOMAS W. BROWN,
in his Individual Capacity and as Trustee
for the Revocable Trust Agreement of Thomas W. Brown,

and

MICHAEL J. ZIMMERMAN,
in his Individual Capacity and as Trustee
of the Michael J. Zimmerman Living Trust,
*Appellants*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held February 10, 2026. Opinion filed March 13, 2026. Affirmed.

*Bradley J. Yeretsky* and *Christopher J. Leopold*, of Stinson LLP, of Kansas City, Missouri, for appellants.

*Brett C. Randol* and *Greg L. Musil*, of Rouse Frets White Goss Gentile Rhodes, P.C., of Leawood, for appellee.

Before ARNOLD-BURGER, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: Ky W. Hornbaker, Thomas W. Brown, and Michael J. Zimmerman, through their respective trusts, entered into an operating agreement and formed Wilderness Holdings, LLC. Brown and Zimmerman later decided to remove Hornbaker from the company and terminate his membership interest under the terms of the operating agreement. Per the agreement, the parties obtained competing expert appraisals, and Hornbaker was owed a payout equal to one-third of the average of the valuations. Brown and Zimmerman sought to pay Hornbaker that amount, less one-third of the company's outstanding liabilities. The parties ultimately sought judgment on stipulated facts, and the district court found the agreement did not allow for a deduction of liabilities.

Brown and Zimmerman timely appeal, claiming the district court erred by not deducting the amount of debt the company owed. Hornbaker asserts the district court correctly applied the provisions of the operating agreement. After our extensive review, we find no error by the district court and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2016, Hornbaker, Brown, and Zimmerman, through their respective trusts, entered into an operating agreement and formed Wilderness Holdings, LLC, in which they each owned an equal share. The company subsequently purchased real property consisting of approximately 442 acres of agricultural and recreational land in Franklin County, which is encumbered by a mortgage. The company constructed a lodge and other buildings and improvements on the property.

In 2022, Brown and Zimmerman decided to remove Hornbaker from the company and terminate his membership interest under the terms of the operating agreement. In compliance with subsection 8.9(a) of the operating agreement, Brown and Zimmerman

provided Hornbaker notice of removal with an expert appraisal and report from Aaron Shinn, who valued the company and its real property at $2,270,000, and the company's equipment and personal property at $120,850. The company, at the time, had mortgage debt totaling $930,833.49. Based on the company valuation they obtained, Brown and Zimmerman then offered Hornbaker $486,672.17 for his one-third share of the company's value. ($2,270,000 + $120,850 - $930,833.49 / by 3 = $486,672.17.)

Hornbaker sent a notice of rejection of removal per subsection 8.9(b) of the operating agreement. The notice included his proposed fair-market valuation of his membership interest based on an appraisal by Derek Shaner, who concluded the total value of the company was $3,585,754. Under subsection 8.9(d)(ii) of the operating agreement, Hornbaker would have then received a payout equal to one-third of the average of these competing valuations. However, a dispute arose as to whether a proportional share of the company's liabilities should be deducted. Hornbaker filed suit, and the parties raised various claims and counterclaims before the district court.

All but one of the claims were resolved through mediation. The lone remaining issue concerned the interpretation and application of subsections 8.6(d) and 8.9 of the operating agreement to determine what was owed to Hornbaker. The parties jointly sought judgment on stipulated facts. The district court granted judgment in favor of Hornbaker, finding the agreement required he be paid based on the average of the values given in the experts' appraisals. The district court held the agreement did not allow for a subsequent deduction of liabilities, which were not accounted for in the experts' appraisals. Additional facts are set forth as necessary.

ANALYSIS

*Standard of Review and Applicable Legal Principles*

Here, the district court effectively granted judgment as a matter of law in favor of Hornbaker, although the district court and the parties did not cite any particular standard of review in the filings and decision below. In any event, the facts are not in dispute because the parties jointly stipulated to the facts. When the facts are undisputed and the district court grants judgment as matter of law, we review the district court's decision de novo. *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 982, 453 P.3d 304 (2019). Interpretation of an operating agreement of a limited liability company is treated under contract principles. *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 417-18, 313 P.3d 808 (2013). Thus, the claim at issue here turns on the contract. Because there are no factual disputes about the contract, this is a pure question of law subject to unlimited review. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 310 Kan. 644, 650, 448 P.3d 383 (2019).

The legal principles of contract interpretation are well-established. "'"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction."'" *Russell v. Treanor Investments*, 311 Kan. 675, 680, 466 P.3d 481 (2020).

> "'An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.'" *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

*Discussion*

Brown and Zimmerman argue the district court erred by failing to construe the plain meaning of the company's "fair-market value" as the value of the company and its assets, less its liabilities. The argument that the fair-market value of a company should ordinarily take into account both the company's assets *and* liabilities might be reasonable as a general proposition. There is no reason to dispute Brown and Zimmerman's contention that, in an arm's length transaction, a reasonably well-informed buyer would consider a company's liabilities before deciding what to pay if the buyer were assuming the debt as part of the transaction. But the issue here is how *the operating agreement* defined the fair-market value of Hornbaker's membership interest. Hornbaker's buyout is controlled by subsection 8.6(d) of the operating agreement, which provides:

> "For the purposes of this Article, the term 'Fair-Market Value of the Member's Membership Interest' shall mean the fair-market value of the Company as appraised by an expert(s) with the expertise to value the Company and its assets, multiplied by the Members Membership Interest expressed as a percentage of all Membership Interests ('*Fair-Market Value of Membership Interest*')."

This provision does not support what Brown and Zimmerman assert. When a contract provides a specific definition for a term, that contractual definition controls in interpreting and applying the agreement. See *Crescent Oil Co. v. Federated Mut. Ins. Co.*, 20 Kan. App. 2d 428, 433-34, 888 P.2d 869 (1995) (contractual definition of "hazardous substance," not a statutory definition, controlled interpretation of the term as used in the contract). Here, subsection 8.6(d) refers only to an expert appraisal "by an expert(s) with the expertise to value the Company *and its assets*." (Emphasis added.) This specific definition, along with the relevant framework set forth in the agreement, does not provide for deducting a proportional share of the company's liabilities, nor does it provide for things beyond the appraisers' valuations to be taken into account.

Both sides obtained an expert valuation, which was required by the operating agreement, to determine the fair-market value of the company. The controlling contractual definition limits the calculation to "the fair-market value of the Company *as appraised by an expert(s)*." (Emphasis added.) In other words, the appraisals must be taken as they are and are determinative of the valuation for purposes of the operating agreement. Brown and Zimmerman were not entitled to make adjustments to the experts' valuations because they disagreed with the valuations or felt the appraisers failed to factor something into their appraisals, i.e., the company's debts.

Brown and Zimmerman further complain the district court effectively rewrote the agreement by construing the fair-market value to only encompass the value of the company's property. Ironically, Brown and Zimmerman's proposed construction would be an improper rewriting of the contract. The effect of their argument would be to rewrite subsection 8.6(d) as:

"For the purposes of this Article, the term 'Fair-Market Value of the Member's Membership Interest' shall mean the fair-market value of the Company as appraised by an expert(s) with the expertise to value the Company and its assets, [*which shall include the value of the company's real and personal property, liquid and intangible assets, and outstanding debts, obligations, and liabilities,*] multiplied by the Member's Membership Interest expressed as a percentage of all Membership Interests ('Fair-Market Value of Membership Interest')." (Emphasis added.)

When Brown and Zimmerman voted to remove Hornbaker from the company, they were required under subsection 8.9(a) to provide him a "Removal Notice," which included:

"(i) The Company's Fair-Market Value of the (Removed) Member's Membership Interest, as defined in Section 8.6[(d)];

6

"(ii) A copy of an expert report(s) relied upon in calculating the Fair Market Value of the (Removed) Member's Membership Interest, as defined herein; and

"(iii) The written vote or consent of the Member's voting or consenting to the removal of the Removed Member."

Hornbaker rejected the company's fair-market valuation of his membership interest and was required under subsection 8.9(b) to provide a "Notice of Rejection of Termination Offer" within 30 days of receiving the removal notice. Under subsection 8.9(d), Hornbaker's notice of rejection was required to include a fair-market valuation of his membership interest as provided in subsection 8.6(d). The company was then required under subsection 8.9(d)(i)-(ii) to:

"(i) Negotiate the release of the Removed Member's guaranty of, or obligations arising out of, Company indebtedness, and

"(ii) Tender to the Removed Member a Cashier's Check in an amount equal to the average of the fair-market valuations contained in the Notice of Removal and Notice of Removed Member's Valuation."

Brown and Zimmerman's proposed construction would also effectively rewrite subsection 8.9(d)(ii) as requiring the company to:

"Tender to the Removed Member a Cashier's Check in an amount equal to the average of the fair-market valuations contained in the Notice of Removal and Notice of Removed Member's Valuation [*less the value of any obligations from which the removed member is released*]." (Emphasis added.)

Nothing in the operating agreement authorized the company to *deduct* such obligations from the payment required under subsection 8.9(d)(ii).

Further, "negotiate" could be construed in multiple ways. On the one hand, "negotiate" could mean "[t]o communicate with another party for the purpose of reaching an understanding," or " [t]o bring about by discussion or bargaining." Black's Law Dictionary 1245 (12th ed. 2024). In other words, to engage in a negotiation. Alternatively, "negotiate" could mean "to transfer (an instrument) by delivery or indorsement, whereby the transferee takes the instrument for value, in good faith, and without notice of conflicting title claims or defenses," or "to transfer possession of an instrument, [usually] by delivery or indorsement and delivery, whereby the transferee becomes its holder." Black's Law Dictionary 1245. In other words, to sign over or assign something from one person to another.

The fact "negotiate" could have multiple meanings does not make it ambiguous as used in the agreement. A written instrument will not be found to be ambiguous unless two or more meanings can reasonably be construed from the contract. The court will not "'strain to create an ambiguity where, in common sense, there is not one.'" *Greer v. Eby*, 309 Kan. 182, 193, 432 P.3d 1001 (2019). Rather, courts construe the agreement as a whole. *Trear*, 308 Kan. at 936.

Looking at the relevant provisions of subsection 8.6(d) and 8.9, nothing in their plain language contemplates a negotiation, i.e., to negotiate in the sense of bargaining or having discussions to reach a common understanding. Specifically, there is no provision requiring or providing for the company and removed member to engage in negotiations regarding their respective obligations for the company's debt. Instead, it appears "negotiate," as used in the agreement, means to transfer the obligations of the removed member to the company by written instrument.

Subsection 8.9(d) requires the company to "[n]egotiate the release of [Hornbaker's] guaranty of, or obligations arising out of, Company indebtedness," and "tender of the Cashier's Check, and . . . release . . . any guaranty and obligations." Among

8

other things, "release" means "[l]iberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced," or "[t]he relinquishment or concession of a right, title, or claim." Black's Law Dictionary 1545. Thus, read as a whole, the company's duty to "[n]egotiate the release of [any] guaranty of, or obligations arising out of, Company indebtedness," means the company was required to free Hornbaker from any personal obligations or guaranty by transferring such obligations or guaranty to the company.

In short, subsection 8.9(d)(ii) required the company to pay Hornbaker an amount equal to the average of the company's fair-market valuation of Hornbaker's membership interest as defined in subsection 8.6(d) and Hornbaker's valuation of his membership interest as defined in subsection 8.6(d). The agreement provides for nothing more. Subsection 8.9(d)(i) required the company to release Hornbaker from any obligations for or guaranty of the company's debt. However, nothing in subsection 8.9(d)—or any other relevant provision of the operating agreement—allowed Brown and Zimmerman, as the remaining owners of the company, to then deduct that amount from the payment owed under subsection 8.9(d)(ii).

The district court properly rejected Brown and Zimmerman's contention that an unwritten provision should be read into the contract allowing the company to deduct a proportional share of its liabilities. The contractual definition controls even if Brown and Zimmerman may now regret the consequences of that definition. And that contractual definition limits the calculation to "the fair-market value of the Company *as appraised by an expert(s)* with the expertise to *value the Company and its assets*." (Emphases added.) Again, the plain terms of subsections 8.9(a) and 8.6(d) control, and nothing in the operating agreement provides that Brown and Zimmerman could tender an offer other than the amount determined by the average of each party's expert's appraised value. Similarly, nothing in the plain terms of subsections 8.6(d) and 8.9(d) provided Brown and Zimmerman with the option to reject Hornbaker's valuation or tender a lesser amount.

9

Brown and Zimmerman further argue the district court's interpretation of the agreement creates an absurd result by creating an unfair windfall for Hornbaker. This argument is unpersuasive as it considers only one side and solely focuses on the present circumstances. By removing Hornbaker from the company, Brown and Zimmerman are taking away Hornbaker's ability to benefit from any future appreciation of the company and its assets or the use of the property as a member. To the extent the company's indebtedness involved real property under mortgage, Brown and Zimmerman would effectively be making Hornbaker pay for equity that only they will enjoy. Under the district court's construction of the contract, both sides receive a benefit and a burden all in compliance with the relevant subsections of 8.6 and 8.9. Hornbaker receives the benefit of a greater payout now at the cost of any future gains. Conversely, Brown and Zimmerman receive a larger ownership interest in the company and can reap the benefit of ongoing equity and appreciation in and of the company's property and assets. But in gaining a larger share of what the company owns, they take on a larger share of what the company owes. This is not an unreasonable or absurd result and is exactly what the operating agreement provided.

Finally, Brown and Zimmerman argue the district court erroneously relied on extrinsic evidence—the experts' appraisals—to define the term "fair-market value." Their argument is misplaced and unpersuasive. The district court did not rely on the experts' competing appraisals to *define* "fair-market value." Rather, it recognized that the contractual definition in subsection 8.6(d) provides: "[T]he term 'Fair-Market Value of the Member's Membership Interest' shall mean the fair-market value of the Company *as appraised by an expert(s)*." (Emphasis added.) Each party chose their respective experts to value the company, and both used the same assets to determine the value they presented to calculate the buyout amount. In other words, the district court recognized that to determine the payout owed to Hornbaker under subsection 8.9(d)(ii), it could only consider the valuations in the experts' appraisals. This is a matter of calculation and application of the operating agreement, not interpretation.

10

The ultimate issue here is not a question of contract interpretation; it is a question of contract enforcement. The operating agreement says what it says, even if Brown and Zimmerman may now regret the terms they bargained for. We observe no error in how the district court applied the operating agreement to calculate Hornbaker's buyout and grant judgment in his favor.

Affirmed.