NOT DESIGNATED FOR PUBLICATION

No. 115,032

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of
GEORGE WAYNE PROBASCO, Deceased.

E. LOU BJORGAARD PROBASCO,
Surviving Spouse,
*Appellant*,

v.

JEFFREY W. PROBASCO, KRISTI A.
HELLMUTH, and PAULA S. FREEMAN,
Decedent's Children,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; FRANK J. YEOMAN JR., judge. Opinion filed October 20, 2017. Reversed and remanded with directions.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, *Thomas L. Theis* and *Timothy P. O'Sullivan*, of Foulston Siefkin, LLP, of Topeka, for appellant.

*Gregory A. Lee*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe LLC, of Topeka, and *Terry E. Beck*, of Beck Law Office, LLC, of Topeka, for appellees.

Before POWELL, P.J., MALONE, J., and LORI A. BOLTON FLEMING, District Judge, assigned.

PER CURIAM: George Wayne Probasco (Wayne) died testate on July 14, 2013. He was survived by his wife of almost 28 years, E. Lou Bjorgaard Probasco (Lou) and by his

1

three adult children from his first marriage. This dispute arises out of the parties' disagreement over the interpretation of Wayne's trust agreement, as restated and amended. The final amendment made bequests to both Lou and the children. The parties formed two different interpretations of three particular bequests in the trust: The children believed the stated language required that the assets flow to them in their entirety; Lou believed that only the assets explicitly stated in the bequests were to go to the children, and any other assets not so mentioned were residue, meant to flow to her.

The district court determined that the language of the three particular bequests was ambiguous and interpreted it in favor of the children. Lou appeals from that decision. We find that the district court erred by failing to follow the rules of law governing the interpretation and construction of the trust agreement, and we also find that the district court's decision in favor of the children was not supported by substantial competent evidence. Accordingly, we reverse the district court's decision and remand with directions for the district court to enter judgment in favor of Lou.

FACTUAL AND PROCEDURAL BACKGROUND

Wayne and Lou were married on December 28, 1985. At the time of their marriage, Wayne had three adult children, Jeffrey W. Probasco, Kristi A. Hellmuth, and Paula S. Freeman. Wayne's former wife and the mother of their children, Beverly J. Probasco, survived Wayne's death on July 14, 2013.

Wayne and Lou, both lawyers, shared offices as well as home life. Over the years, Lou developed a successful law practice while Wayne came to devote less time to practicing law and more time on his investments. The couple entered into a prenuptial agreement that contemplated maintaining separate property. Over time, Wayne relied increasingly on Lou to advance money for his share of the expenses. Wayne also

2

assumed control over a significant amount of Lou's funds, given to him to invest for her in checks payable to "Lou's Savings," which he had invested along with his own funds.

Wayne's unexpected death on July 14, 2013, left no opportunity to settle accounts with Lou. The amount due Lou increased thereafter when she incurred the expenses of his last illness, funeral, and burial. In addition, 10 weeks following Wayne's death, Lou was notified that Beverly had filed an affidavit of legal interest at the Shawnee County Register of Deeds claiming a 25 percent interest in Lou's homestead.

To protect her homestead rights and to obtain reimbursement of her expenses, Lou filed a petition for probate of Wayne's will on January 10, 2014. When Lou submitted her claims as a creditor, Wayne's adult children responded with objections and asserted setoffs against her, including claims for rent and maintenance of the homestead and for management fees for Wayne's investment of her funds. Also, Beverly pursued her lien claim on the homestead.

Nearly all of Wayne's assets passed outside the will by means of beneficiary designations on life insurance and annuities, and, in larger part, through the G. Wayne Probasco Trust Agreement dated December 10, 1998. The original trust agreement was superseded by a restated trust agreement dated April 21, 2006, which was subsequently amended five times—the fifth and last amendment being dated April 15, 2013 (Fifth Amendment). Wayne was the scrivener of the Fifth Amendment.

After conducting discovery, Lou and the children engaged in mediation and then entered into a written settlement agreement dated May 21, 2015. To settle her claims, which totaled $2,516,016, Lou agreed to accept $1,100,000. The settled claims were limited to restoring to Lou her own funds that had been in Wayne's custody and repaying the money she had advanced to Wayne or for his benefit before and after he died. The settlement agreement was not intended to cover assets she was entitled to receive as a

3

trust beneficiary. It was also agreed that Beverly's lien on the homestead would be dismissed. The district court approved the settlement agreement on June 15, 2015.

*Wayne's trust agreement*

Wayne's trust agreement, including the restated trust agreement and the various amendments, provided for Lou to receive real estate plus liquid assets that could be readily converted into cash available to meet expenses. The Fifth Amendment provided for disposition of the assets held in the trust as follows:

"1. To be given to E. LOUISE BJORGAARD PROBASCO the following real
estate:
　　a.　Property which is known as 1431 SW Urish Road,
　　　　Topeka, Kansas, legal description: NE 1/4 LESS ROW,
　　　　SUBDIVSION: Sec: 06Twn: 12RNG: 15 QTR; NE
　　b.　Property known as 615 SW Topeka Blvd., Topeka,
　　　　Kansas, legal description: TOPEKA AVE LTS
　　　　191-193-l95-197 N 4' 199 ORIGINAL TOWN SUBDIVISION:
　　　　ORIGINAL TOWN SEC: 31 TWN: 11 RNG: 16 QTR: NW
　　c.　Property on SW K4 HWY, Topeka Kansas,
　　　　legal description: SW1/4 NW 1/4 LESS R/W
　　　　SUBDIVISION: SEC: 25 TWN: 12 RNG: 13 QTR:
"2. The following items shall be distributed equally to my three children, PAULA
FREEMAN, JEFF PROBASCO, and KRISTI HELMUTH [*sic*] as follows:
　　a. Mutual fund account with Vanguard
　　b. Stock fund account with Merrill Lynch
　　c. Stock certificate with Glaxo Smith
　　d. Account with Stiffel Nickels [*sic*]
　　e. Wells Fargo stocks
　　f. Westar Energy stock
　　g. Bond and stock account with Oppenheimer
　　h. Bond account with Edward Jones
　　i. Two real estate contracts held by Kansas Secured Title Browning and Bylsma

4

"3. All other assets in the Trust shall go to my wife, E. LOU BJORGAARD PROBASCO."

*The disputed bequests*

On June 16, 2015, one day after the district court approved the settlement agreement, Lou's legal counsel sent a letter to a representative of the successor trustee, CoreFirst Bank & Trust (CoreFirst), requesting a recalculation of three bequests in the Fifth Amendment, ¶¶ 2.b., 2.g., and 2.h. Specifically, Lou claimed that the residuary assets that should flow to her were comprised of those assets at Merrill Lynch which were not in a stock fund (a money market account plus a health care real estate investment trust [REIT] and a number of individual stocks), those assets at Oppenheimer which were not bonds and stocks (a money market account), and those assets at Edward Jones which were not bonds (shares in two mutual funds).

In response to Lou's letter, the children filed a petition to enforce the settlement agreement, wherein they claimed that the settlement agreement entitled Lou to receive only the $1.1 million in liquid assets in addition to the real property. They claimed that there was no residue to which Lou was entitled to receive under the amended restated trust agreement other than one small account at Waddell and Reed Securities valued at about $20,000. All total, there was approximately $3.6 million in liquid assets, based on date of death values, to be distributed by CoreFirst under the Fifth Amendment of the restated trust agreement. According to Lou's interpretation of the instrument, the children were entitled to receive specific bequests totaling approximately $3.2 million and she was entitled to receive the residuary valued at about $450,000. According to the children's interpretation of the instrument, they were entitled to receive all the liquid assets except for the one account at Waddell and Reed Securities.

The district court held an evidentiary hearing on August 18, 2015, on the children's petition to enforce the settlement agreement. Ryan Hellmer, representative of

CoreFirst, was the only witness to testify on behalf of the children. Hellmer testified that he began his employment with CoreFirst approximately nine months after Wayne died. Hellmer was not employed by the bank at the time the brokerage assets listed in the Fifth Amendment were collected. After the brokerage accounts were liquidated, all of the assets were collected and held in one account with CoreFirst as the trustee.

Hellmer testified that he initially believed that only one asset not specified in the trust would flow to Lou as residue, i.e., the Waddell and Reed Securities valued at about $20,000. Hellmer initially considered each disputed specific bequest as referring to the entire account at each brokerage firm, flowing entirely to the children because the use of the word "account" was singular and there was only one account number at each brokerage firm. However, Hellmer, who was unaware that Wayne was a sophisticated investor, agreed it was reasonable to assume that a sophisticated investor would use more precise descriptions of the assets subject to distribution under the Fifth Amendment. Once Hellmer was presented with Lou's interpretation of the instrument, he acknowledged that her position on the calculation of the assets was also reasonable.

Hellmer agreed that there were assets in the Merrill Lynch account, including cash and a number of individual stocks, which normally would not be identified as a stock fund. Likewise, Hellmer agreed that there were assets in the Oppenheimer account which were not bonds and stocks, and he acknowledged that there were assets in the Edward Jones account which were not bonds. Hellmer admitted that once he was aware of the possibility for residuary assets within the accounts, he was able to identify the assets by Wayne's distinctions in the bequests and then calculate the estimated value of the residuary. Ultimately, Hellmer did not believe the language of the Fifth Amendment was vague or ambiguous, but he declined to provide his professional opinion regarding the interpretation of the three bequests at issue.

6

Lou testified that Wayne was a sophisticated investor who knew the difference between a general account and specific assets within the account. During the presentation of the evidence, Lou offered exhibit F, which was a form associated with Wayne's tax return in which Wayne specifically described his business or profession as an "investor" in addition to attorney; however, the district court refused to admit the exhibit.

Randy Clayton, the owner of a registered investment advisory firm, testified that he had met personally with Wayne to discuss investments and that Wayne met the SEC's regulatory definition of a sophisticated investor. As to the Merrill Lynch account, Clayton testified that based on his experience in the investment industry, the term "stock fund" is commonly used and understood to mean a publicly traded mutual fund, not individual stocks. Clayton was shown the monthly brokerage statements, exhibits A, B, and E, and he was able to readily identify the assets that were stock funds and bond funds and other types of investments such as individual stocks, REITs, and money market funds.

Don Schwart, a registered investment advisor, was a personal friend of Wayne throughout his marriage to Lou. Schwart testified that unquestionably Wayne knew the difference between a stock fund, an individual stock, or individual bonds. He testified that Wayne considered himself a professional investor during the last years of his life.

The district court filed a memorandum decision and order on November 23, 2015. The district court found that the three disputed bequests in the Fifth Amendment, ¶¶ 2.b., 2.g., and 2.h., were brokerage accounts, which contained different types of investments. The district court further found that the brokerage statements set forth the nature of the investments held in each brokerage account. The district court acknowledged that the different types of assets in each account were not synonymous. The district court found that Wayne was not only a practicing attorney, but he was a "sophisticated investor" who reviewed his brokerage account statements regularly. The district court found that the

7

language of the settlement agreement was not ambiguous, but the disputed bequests from the Fifth Amendment were ambiguous because both parties' readings were reasonable.

Because it found that the Fifth Amendment to the restated trust agreement was ambiguous, the district court found it was required to ascertain Wayne's intent when he executed the amendment. The district court determined that Wayne's intent was signaled by his use of the singular word "account," rather than the modifying language of "stock fund," "bond and stock," and "bond," because Wayne did not have separate accounts for those specific types of assets with the brokerage firms. The district court also found that focusing on the precise language of the Fifth Amendment was misplaced because other errors reflected carelessness in drafting: i.e., the misspelling of Stifel Nicolaus as "Stiffel Nickels," and the misspelling of one of the daughter's last name. Ultimately, the district court ruled in favor of the children and ordered that all of the assets in the disputed bequests flow to the children in their entirety. Lou filed a timely notice of appeal.

ANALYSIS

On appeal, Lou first argues that the district court erred as a matter of law by failing to follow the rules of law governing the interpretation and construction of the trust agreement. Second, Lou argues that the district court's decision was contrary to the evidence and not supported by any substantial evidence. Third, Lou argues that the district court erroneously refused to admit evidence proving that Wayne was a professional investor. Finally, Lou argues that if the district court was correct in finding that the three disputed accounts described assets that did not exist, then the assets must pass to Lou as a matter of law through the residuary clause.

The adult children argue that the district court did not err in determining that ambiguity existed in the Fifth Amendment to the restated trust agreement. The children also assert that substantial competent evidence supports the district court's interpretation

8

that the Fifth Amendment was vague and ambiguous. The children further argue that the district court did not abuse its discretion in refusing to consider cumulative and uncontroverted evidence. Finally, they argue that the existence of ambiguity in the trust agreement does not dictate that the bequests to the children fail in their entirety.

*Was the Fifth Amendment to the restated trust agreement ambiguous?*

In district court, both parties asserted that the Fifth Amendment to the restated trust agreement was unambiguous, but their interpretations of the instrument were not the same. The district court found that the disputed bequests from the Fifth Amendment were ambiguous because both parties' readings of the instrument were reasonable. Although the resolution of this appeal does not necessarily depend on whether the trust instrument was ambiguous or unambiguous, we will first address whether the district court erred in finding that the Fifth Amendment to the restated trust agreement was ambiguous.

The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. *Hamel v. Hamel*, 296 Kan. 1060, 1068, 299 P.3d 278 (2013) (interpreting a trust). When interpreting a trust, the court's primary duty is to ascertain the settlor's intent by reading the trust in its entirety. If that intent can be ascertained from the express terms of the trust, the court must effectuate those terms unless they are contrary to law or public policy. 296 Kan. at 1068.

A written instrument will not be found to be ambiguous unless two or more meanings can reasonably be construed from the contract. The court will not strain to find an ambiguity where, in common sense, there is none. *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 420, 313 P.3d 808 (2013). Where ambiguity or uncertainty is involved in a written instrument, the parties' intentions are ascertained by considering the language used, the circumstances existing when the instrument was made, the objective of the written instrument, and other circumstances tending to clarify the real

9

intention of the party or parties. *Byers v. Snyder*, 44 Kan. App. 2d 380, 386, 237 P.3d 1258 (2010), *rev. denied* 292 Kan. 964 (2011).

The Fifth Amendment to the restated trust agreement was executed in April 2013, approximately three months before Wayne died. The document laid out the history of the original trust agreement, the restated trust agreement, and the previous four amendments. It provided for the resolution of taxes, charges, and the fulfillment of specific bequests, after which the remaining estate was to be divided by giving Lou three parcels of real property, distributing the investment "items" to the children, and "all other assets" in the trust were to go to Lou. The remaining provisions of the trust agreement dated in December 1998, except as amended, remained in full force and effect.

Here, the children argue that Wayne intended to leave them all of the assets within the disputed bequests because he used the word "account" for each. The children note that there was only one account number at each brokerage firm. However, Lou argues that because Wayne modified the language on the bequests, rather than simply stating "account," as he did with the Stifel Nicolaus bequest, he intended for his children to receive only those assets specified, allowing all other types of assets within the accounts to flow to Lou as residuary.

The two conflicting interpretations of the three specific bequests in the Fifth Amendment can both be reasonably construed from the language of the instrument, which supports the district court's finding of ambiguity as to that document. We conclude the district court did not err in finding the instrument to be ambiguous. To attempt to ascertain Wayne's intent regarding the ambiguity in the Fifth Amendment, we must first turn to the language of the trust agreement in its entirety, applying recognized rules of construction. See *Byers*, 44 Kan. App. 2d at 386 (where ambiguity exists, the parties' intentions are ascertained by considering the language used and other circumstances).

10

*Interpretation and construction of the trust agreement*

Lou's primary argument is that the district court erred as a matter of law by failing to follow the rules of law governing the interpretation and construction of the trust agreement. As we have previously stated, appellate courts exercise unlimited review over the interpretation and legal effect of written instruments and are not bound by the lower court's interpretation. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

When interpreting a trust, "the court's primary function is to ascertain the intent of the settlor by reading the trust in its entirety." *Hamel*, 296 Kan. at 1068. If the settlor's intent can be ascertained from the express terms of the trust within its four corners, "the court must give effect to those terms unless they are contrary to law or public policy." 296 Kan. at 1068; see *In re Estate of Haneberg,* 270 Kan. 365, 371, 14 P.3d 1088 (2000).

Courts are required to "'arrive at the intention of the testator from an examination of the whole instrument, if consistent with rules of law, giving every single provision thereof a practicable operative effect.'" *In re Estate of Crawshaw,* 15 Kan. App. 2d 273, 279, 806 P.2d 1014 (1991) (quoting *In re Estate of Porter,* 164 Kan. 92, 100, 187 P.2d 520 [1947]). "Words are never to be rejected as meaningless or repugnant if by any reasonable construction they may be made consistent and significant. Excision is a 'desperate remedy.'" *In re Estate of Cline*, 170 Kan. 496, 502, 227 P.2d 157 (1951) (quoting *Regnier v. Regnier*, 122 Kan. 59, 61, 251 P. 392 [1926]).

Here, the district court failed to enforce the Fifth Amendment to the restated trust agreement as written. Instead, the district court excised language from the instrument and decided that specific language signaling the settlor's intent should be deleted, changing the instrument to read as follows:

11

"~~Stock fund~~ account with Merrill Lynch

"~~Bond and stock~~ account with Oppenheimer

"~~Bond~~ account with Edward Jones"

The district court essentially struck the words preceding the word "account" in each disputed bequest in order to comport with its interpretation that the weight of Wayne's intent was exclusively on the word "account." However, the district court failed to acknowledge that in excising the qualifying language, it was ignoring language that was intentionally used by Wayne when he executed the Fifth Amendment. In making its finding of ambiguity, the district court acknowledged that Lou's interpretation of the disputed bequests was a reasonable one. If giving effect to the qualifying language results in a reasonable reading of the bequest, that language cannot then be excised as meaningless. *Estate of Cline*, 170 Kan. at 502.

Moreover, the district court's construction of the three disputed bequests and its focus on the singular term "account" was inconsistent with Wayne's specific bequest of the "account with Stiffel Nickels [*sic*]." Wayne knew how to describe an investment as simply an account with a brokerage firm, as evidenced by his description of the account with Stifel Nicolaus, when he wanted the entire account to go to the children. The fact that Wayne modified his accounts with Merrill Lynch, Oppenheimer, and Edward Jones with descriptive types of investments reflects a clear intent that Wayne did not intend for all the assets in those three accounts to go to the children.

Lou's argument that the district court erred by excising language from the trust instrument is persuasive. The district court deleted language meaningful to the settlor in order to avoid giving it effect. Based on this assessment, it is reasonable to infer from the language of the trust agreement in its entirety that Wayne intended for the three disputed bequests to be distributed as written:  Only the stock fund at Merrill Lynch shall go to the children; only the bonds and stocks at Oppenheimer shall go to the children; and only the

12

bonds at Edward Jones shall go to the children. The remaining investments held at those three brokerage firms were intended to pass to Lou under the residuary clause.

*Evidence presented at the hearing*

In addition to interpreting the language of the trust agreement in its entirety, the district court properly considered the testimony presented at the evidentiary hearing in order to attempt to ascertain Wayne's intent. On appeal, Lou argues that the ultimate decision reached by the district court was not supported by any substantial evidence and in fact was contrary to the evidence presented at the hearing.

When determining a settlor's intent using parol evidence, the district court is making a factual finding. On appeal, this court reviews factual findings under the substantial competent evidence standard. Substantial evidence is evidence that is both relevant and possessing substance, furnishing a basis of fact from which the issues can reasonably be resolved. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015).

When a verdict or trial court decision is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

Hellmer, representing CoreFirst, testified at the evidentiary hearing as a witness for the children. Hellmer testified that he began his employment with CoreFirst approximately nine months after Wayne died, and he initially was unaware that Wayne was a sophisticated investor. Once Hellmer was presented with Lou's interpretation of the instrument, he acknowledged that her position on the calculation of the assets was

13

reasonable. He agreed that there were assets in the Merrill Lynch account, including cash and a number of individual stocks, which normally would not be identified as a stock fund. Likewise, he agreed that there were assets in the Oppenheimer account which were not bonds and stocks, and he agreed there were assets in the Edward Jones account which were not bonds. Ultimately, Hellmer declined to provide his professional opinion regarding the interpretation of the three bequests at issue.

In addition to Hellmer's testimony, the district court also heard from Clayton and Schwart, both professional investors who knew Wayne personally and through their shared interests in finances and investing. Clayton testified that Wayne met the SEC's regulatory definition of a sophisticated investor. Schwart testified that Wayne was "quite conversant about investments in general." Schwart also testified that Wayne "unquestionably" knew the difference between a stock fund, an individual stock, and individual bonds. Finally, Lou confirmed that Wayne was a sophisticated investor who knew the difference between a general account and specific assets in the account.

Based on this evidence, the district court found that Wayne was a sophisticated investor who reviewed his brokerage firm statements regularly. The brokerage statements set forth the nature of the investments held in each fund. The district court acknowledged that the different types of assets in each account were not synonymous. Nevertheless, the district court opted for a simple account-means-account determination. It cited the spelling errors regarding one of the brokerage firms and Wayne's daughter's last name as evidence of carelessness significant enough to undermine the language of the instrument.

While this court does not reweigh evidence, here, there was almost no evidence to support the district court's interpretation of the trust instrument other than Wayne's use of the singular word "account" and the spelling errors. Hellmer admitted that once he was aware of the possibility for residuary assets within the accounts, he was able to identify the assets by Wayne's distinctions in the bequests and then calculate the estimated value

14

of the residuary. Both Clayton and Schwart testified that Wayne knew how to distinguish the various types of investments and assets. All three men testified as to those distinctions, and an exhibit from the SEC reinforced those distinctions.

Based upon the record on appeal, we conclude that the district court's interpretation of the Fifth Amendment to the restated trust agreement was not supported by substantial competent evidence, i.e., evidence that is both relevant and possessing substance, furnishing a basis of fact from which the issues can reasonably be resolved. See *Wiles*, 302 Kan. at 73. Instead, the overwhelming weight of the evidence presented at the hearing supports Lou's interpretation that Wayne intended for the three disputed bequests to be distributed as written: Only the stock fund at Merrill Lynch shall go to the children; only the bonds and stocks at Oppenheimer shall go to the children; and only the bonds at Edward Jones shall go to the children. The remaining investments held at those three brokerage firms were intended to pass to Lou under the residuary clause. This interpretation is consistent with the language of the trust instrument as properly interpreted under the general rules of construction governing trust agreements.

To sum up, we conclude that the district court erred by failing to follow the rules of law governing the interpretation and construction of the trust agreement. We also conclude that the district court's decision in favor of the children was not supported by substantial competent evidence presented at the hearing. Accordingly, we reverse the district court's judgment and remand with directions for the district court to enter judgment in favor of Lou. Based on this disposition, we do not need to reach the final two issues raised by Lou regarding the evidentiary rulings at the hearing and whether the disputed bequests failed as a matter of law.

Finally, after oral arguments were presented in this case, Lou filed a timely motion with this court for an award of attorney fees and expenses on appeal totaling $91,342.50, to be paid from assets of the G. Wayne Probasco Trust. The children filed a response and

15

raised numerous objections to any award of attorney fees and expenses on appeal, including an objection to the reasonableness of the requested attorney fees under the standards set forth in Kansas Rules of Professional Conduct (KRPC) 1.5(a) (2017 Kan. S. Ct. R. 292). We agree with Lou that under K.S.A. 58a-1004, in a judicial proceeding involving the administration of a trust, the court may award costs and expenses, including reasonable attorney fees, to any party as justice and equity may require, to be paid by another party or from the trust that is the subject of the controversy.

However, in the exercise of this court's discretion under the statute and under Supreme Court Rule 7.07(b) (2017 S. Ct. R. 50), we deny Lou's request for attorney fees and expenses on appeal. We note that each party was responsible for their own attorney fees and expenses in district court, despite numerous requests for attorney fees made by both parties throughout the proceedings. Based on this disposition, we do not need to reach the contested issue as to whether the requested attorney fees are reasonable in amount under the standards of KRPC 1.5(a).

Reversed and remanded with directions.